AO 242 (12/11) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

# UNITED STATES DISTRICT COURT

for the

| | | |
|---|---|---|
| Drucilla Ramona Graves | ) ) ) ) | |
| *Petitioner* | ) | |
| v. | ) ) | Case No. 6:23-CV-335-IM |
| | ) | *(Supplied by Clerk of Court)* |
| Delores Matteucci | ) ) | |
| *Respondent* | ) | |

*(name of warden or authorized person having custody of petitioner)*

### PETITION FOR A WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241

#### Personal Information

1.    (a) Your full name:    Drucilla Ramona Graves

       (b) Other names you have used:    Edward Wayne Schnee, II

2.    Place of confinement:

       (a) Name of institution:    Oregon State Hospital

       (b) Address:    2600 Center St. NE Salem OR 97301

       (c) Your identification number:    82247

3.    Are you currently being held on orders by:

       ❏ Federal authorities      ☑ State authorities      ❏ Other - explain:

4.    Are you currently:

       ❏ A pretrial detainee (waiting for trial on criminal charges)

       ❏ Serving a sentence (incarceration, parole, probation, etc.) after having been convicted of a crime

       If you are currently serving a sentence, provide:

           (a) Name and location of court that sentenced you:

           (b) Docket number of criminal case:

           (c) Date of sentencing:

       ❏ Being held on an immigration charge

       ☑ Other *(explain)*:    Held on a conditional release revocation by the PSRB on a GEI sentence

AO 242 (12/11) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

## Decision or Action You Are Challenging

5.    What are you challenging in this petition:

☐ How your sentence is being carried out, calculated, or credited by prison or parole authorities (for example, revocation or calculation of good time credits)

☐ Pretrial detention

☐ Immigration detention

☐ Detainer

☐ The validity of your conviction or sentence as imposed (for example, sentence beyond the statutory maximum or improperly calculated under the sentencing guidelines)

☐ Disciplinary proceedings

☒ Other *(explain)*:    Hospitalization due to wrongful revocation of conditional release, in violation of my 4th Amendment rights

6.    Provide more information about the decision or action you are challenging:

(a) Name and location of the agency or court:    Psychiatric Security Review Board , Salem OR

(b) Docket number, case number, or opinion number:

(c) Decision or action you are challenging *(for disciplinary proceedings, specify the penalties imposed)*:

I was wrongly revoked without good cause and continue to be hospitalized for reasons that seem to be punitive, despite having no need for hospital-level care and an inability of Oregon State Hospital to provide a proper or therapeutic environment for a GEI patient

(d) Date of the decision or action:    07/13/2022

## Your Earlier Challenges of the Decision or Action

7.    **First appeal**

Did you appeal the decision, file a grievance, or seek an administrative remedy?

☒ Yes          ☐ No

(a) If "Yes," provide:

(1) Name of the authority, agency, or court: Oregon Court of appeals

(2) Date of filing: December 2022

(3) Docket number, case number, or opinion number: 179526

(4) Result: Pending

(5) Date of result:

(6) Issues raised: • PSRB erred - No substantial evidence to support revocation
• PSRB erred in denying request for evaluation for conditional release
• PSRB erred in denying jurisdictional discharge - No qualifying disorder

AO 242 (12/11) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

(b) If you answered "No," explain why you did not appeal:

8.     **Second appeal**
       After the first appeal, did you file a second appeal to a higher authority, agency, or court?
       ❒ Yes                    ❒ No
       (a) If "Yes," provide:
               (1) Name of the authority, agency, or court:

               (2) Date of filing:
               (3) Docket number, case number, or opinion number:
               (4) Result:
               (5) Date of result:
               (6) Issues raised:

(b) If you answered "No," explain why you did not file a second appeal:

9.     **Third appeal**
       After the second appeal, did you file a third appeal to a higher authority, agency, or court?
       ❒ Yes                    ❒ No
       (a) If "Yes," provide:
               (1) Name of the authority, agency, or court:

               (2) Date of filing:
               (3) Docket number, case number, or opinion number:
               (4) Result:
               (5) Date of result:
               (6) Issues raised:

AO 242 (12/11) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

 

(b) If you answered "No," explain why you did not file a third appeal:


10. **Motion under 28 U.S.C. § 2255**

In this petition, are you challenging the validity of your conviction or sentence as imposed?

❏ Yes                ☑ No

If "Yes," answer the following:

(a)    Have you already filed a motion under 28 U.S.C. § 2255 that challenged this conviction or sentence?

     ❏ Yes          ❏ No

     If "Yes," provide:

     (1) Name of court:

     (2) Case number:

     (3) Date of filing:

     (4) Result:

     (5) Date of result:

     (6) Issues raised:


(b)    Have you ever filed a motion in a United States Court of Appeals under 28 U.S.C. § 2244(b)(3)(A), seeking permission to file a second or successive Section 2255 motion to challenge this conviction or sentence?

     ❏ Yes          ☑ No

     If "Yes," provide:

     (1) Name of court:

     (2) Case number:

     (3) Date of filing:

     (4) Result:

     (5) Date of result:

     (6) Issues raised:

AO 242 (12/11) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

(c)     Explain why the remedy under 28 U.S.C. § 2255 is inadequate or ineffective to challenge your
        conviction or sentence:

11.     **Appeals of immigration proceedings**

        Does this case concern immigration proceedings?

        ☐ Yes                    ☑ No

                If "Yes," provide:

        (a)     Date you were taken into immigration custody:

        (b)     Date of the removal or reinstatement order:

        (c)     Did you file an appeal with the Board of Immigration Appeals?

                ☐ Yes                    ☐ No

                If "Yes," provide:

                (1) Date of filing:

                (2) Case number:

                (3) Result:

                (4) Date of result:

                (5) Issues raised:

        (d)     Did you appeal the decision to the United States Court of Appeals?

                ☐ Yes                    ☐ No

                If "Yes," provide:

                (1) Name of court:

                (2) Date of filing:

                (3) Case number:

(4) Result:

(5) Date of result:

(6) Issues raised:

12. **Other appeals**

Other than the appeals you listed above, have you filed any other petition, application, or motion about the issues raised in this petition?

☐ Yes        ☑ No

If "Yes," provide:

(a) Kind of petition, motion, or application:

(b) Name of the authority, agency, or court:

(c) Date of filing:

(d) Docket number, case number, or opinion number:

(e) Result:

(f) Date of result:

(g) Issues raised:

### Grounds for Your Challenge in This Petition

13. State every ground (reason) that supports your claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

**GROUND ONE:** Conditional release was revoked without good cause due to discrimination based on race, political affiliation and personal bias on the part of a PSRB monitor/group home administrator who has since been fired for similar treatment of other residents

AO 242 (12/11) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

(a) Supporting facts *(Be brief. Do not cite cases or law.)*:

Amy Schubert revoked me mainly because I disagreed with her extreme liberal, Marxist ideology. She claimed I "charged at her" but offers no evidence and witness report doesn't support her claim (see attachments). She also claimed I "threatened her church", a bizarre statement since I had no knowledge of her religious affiliations, if any. Note Michael Reid's interview in which he describes Amy's hour-long diatribe against religion and in support of her own atheism. This proves she's a liar. Neither Ms. Schubert nor anyone else from her agency testified at my revocation hearing. The PSRB ignored testimony from my treating Psychiatrist in favor of 3rd-hand hearsay.

(b) Did you present Ground One in all appeals that were available to you?

☑ Yes          ☐ No

**GROUND TWO**:  The PSRB does not have jurisdiction over me while hospitalized at OSH. According to my sentencing, I was to be supervised by SHRP (State Hospital Resource Panel) while at OSH, due to my Tier 2 (non-measure 11) charges. SHRP was to have the discretion to conditionally release or discharge me. My sentence was effectively changed five years after being imposed when SHRP was disbanded.

(a) Supporting facts *(Be brief. Do not cite cases or law.)*:

SHRP was created to supervise GEI patients with non-measure 11 charges with the intent to be a less stringent version of the PSRB. They were disbanded and all patients under their jurisdiction were transferred to the PSRB, effectively making my sentence more harsh than intended. Flash cards currently in use for education of .370 patients (see attachment) show that patients found GEI for Tier 2 charges are to be conditionally released directly, while only measure 11 GEI patients are to first be hospitalized at OSH. This change was apparently made after the SHRP was disbanded, so I should not even be hospitalized at OSH at all. If a community provider thought I was in need of more intensive treatment, it would be more easily provided in a short-term local psych ward visit.

(b) Did you present Ground Two in all appeals that were available to you?

☐ Yes          ☑ No

**GROUND THREE**:  The hearing conducted by the PSRB, like all their hearings, was unconstitutional, violating all stantard rules of evidence. The PSRB accepted third-hand hearsay from an OSH doctor with no first-hand knowledge of the alleged evidents or facts to which he testified, while ignoring the testimony of my then-current treating physician at OSH who recommended full discharge and alternatively, reinstatement of CR.

(a) Supporting facts *(Be brief. Do not cite cases or law.)*:

The woman who initiated my revocation did not appear at my hearing to make her accusations so that she could be cross-examined, as she would have been perjuring herself. So instead, a ringer *was used.* (a former treating OSH doctor who had not seen or treated me since before my conditional release). This doctor, the State's only witness, would not even turn his camera on for the video hearing to be observed raising his hand while being sworn. Two of the three PSRB members present also refused to turn on their cameras and were clearly not even paying attention. The burden of proof was ostensibly on the State, and they presented no actual evidence. The PSRB ignored all the actual evidence and found in favor of the State. My only "accuser", Amy Schubert, would not appear

(b) Did you present Ground Three in all appeals that were available to you?  at my hearing to make her false

☑ Yes          ☐ No

Claims - She has since been fired, so her claims are invalid,

AO 242 (Rev. 09/17) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

**GROUND FOUR:**   The revocation of my conditional release violates the Americans with Disabilities Act and constitutes breach of contract on the part of the PSRB, Oregon State Hospital and Amy Schubert/Columbia County Mental Health. I fulfilled my obligations under the release agreement to the best of my ability as a person labeled as mentally disabled. I did not receive reasonable accommodation for this disability.

(a) Supporting facts *(Be brief. Do not cite cases or law.)*:

The condidtional release agreement required CCMH to provide mental health treatment services. For the 29 days I was there I was not allowed to meet with the doctor/prescriber or taken to activate my SSI or SNAP benefits, despite repeated requests. My CR was then revoked on the claim that I was becoming symptomatic, without ever setting up an apt. with their doctor to make that assessment and any needed med adjustments, which would have been the first step if I were symptomatic, as part of the "mental health treatment services" CCMH was obligated and paid to provide. Instead they revoked me at the first alleged sign of symptoms, absent any violent behavior.

(b) Did you present Ground Four in all appeals that were available to you?

☐ Yes                  ☐ No

14.   If there are any grounds that you did not present in all appeals that were available to you, explain why you did not:   There is still an appeal to the revocation order pending; these issues will be raised though the PSRB has no interest in following the law or rules of evidence and due to conflicts of interest members of the board are biased against me to begin with. This makes it impossible to get anything resembling a fair hearing in their mock courtroom. Hence this habeas petition to have their questionable decision reviewed by an actual court.

### Request for Relief

15. State exactly what you want the court to do: I want the PSRB ordered to reinstate my conditional release and/or release me from OSH forthwith. Alternatively release me pending decision on my appeal to the PSRB's revocation order.

AO 242 (Rev. 09 17)  Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

## Declaration Under Penalty Of Perjury

If you are incarcerated, on what date did you place this petition in the prison mail system:

2/22/23

I declare under penalty of perjury that I am the petitioner, I have read this petition or had it read to me, and the information in this petition is true and correct.  I understand that a false statement of a material fact may serve as the basis for prosecution for perjury.

Date: 02/22/2023

Drucilla Graves

*Signature of Petitioner*

*Signature of Attorney or other authorized person, if any*

Liza Langford
Attorney at Law
PO Box 96302
Portland, Or. 97210
503-274-9070
ljanelaw@yahoo.com

February 6, 2023

Drucilla Graves
OSH
2600 Center Street, NE
Salem, Or. 97301

Re:     Appeal

Dear Ms. Graves:

Please confirm you received the enclosed copy of your brief. I will send you a copy of the State's Response once I get it.  Good luck with your hearing in March. Thank you so much.

Very truly yours,

Liza Langford
OSB #882509 Attorney

## IN THE COURT OF APPEALS OF THE STATE OF OREGON

| | | |
|---|---|---|
| EDWARD WAYNE SCHNEE AKA, DRUCILLA GRAVES, | ) ) ) | Agency number 13-2628 |
| Petitioner, | ) ) | |
| v. | ) ) | Court of Appeals No. 179526 |
| PSYCHIATRIC SECURITY REVIEW BOARD, | ) ) ) | |
| Respondent. | ) | |

Confidential brief

Petition For Judicial Review from the Final Order of the Psychiatric Security
Review Board July 27, 2022

Liza Jane Langford, OSB #882509
Attorney at Law
PO Box 96302
Portland, Or. 97296
Phone: (503) 274-9070
ljanelaw@yahoo.com
Attorney for Petitioner

Ellen F. Rosenblum, OSB #753239
Attorney General
Benjamin Gutman, OSB #160599
Solicitor General
1162 Court Street N.E.
Salem, Oregon 97301-4096
Phone: (503) 378-4402
Attorneys for Respondent                          December/2022

# IN THE COURT OF APPEALS OF THE STATE OF OREGON

## TABLE OF CONTENTS

STATEMENT OF THE CASE ................................................................ Page 1

       Nature of the Proceeding .................................................. Page 1

       Nature of the Judgment .................................................... Page 1

       Jurisdiction ..................................................................... Page 2

       Perfection of Appeal ....................................................... Page 2

       Questions Presented ...................................................... Page 1-2

       Summary of Arguments ................................................... Page 2

       Summary of Facts ........................................................... Page 2

ASSIGNMENT OF ERROR ONE

1.)    The PSRB erred, in revoking Petitioner's conditional release, because there was not substantial evidence to support revocation. .....................16

       a. Preservation of Error ................................................... Page 16

       b. Standard of Review ..................................................... Page 18

       c. Argument .................................................................... Page 19

ASSIGNMENT OF ERROR TWO

2.)    The PSRB erred, in denying Petitioner a request for an evaluation, by finding that Petitioner could not be adequately controlled and treated in the community on conditional release ....................................27-28

a. Preservation of Error ..................................................................... Page 28

b. Standard of Review ...................................................................... Page 31

c. Argument ..................................................................................... Page 32

ASSIGNMENT OF ERROR THREE

The **PSRB** erred, in finding there was jurisdiction, Petitioner no longer

had a qualifying mental disorder and a jurisdictional discharge was

appropriate. .................................................................................. Page 30

a. Preservation of Error ..................................................................... Page 30

b. Standard of Review ...................................................................... Page 31

c. Argument ..................................................................................... Page 31

CONCLUSION ........................................................................................ Page 33

## INDEX TO EXCERPT OF RECORD

Commit Order................................................................................. ER-1 to ER-5

Exhibit 483 Revocation Letter from Ms. Amy Schubert..............ER-6 to ER 7

Exhibit 498 Petitioner's Grievance Letter...........................ER-8 to ER 20

## TABLE OF AUTHORITIES

### Cases

Cardwell v. Psychiatric Security Review Board, 38 Or. App. 565, 590 P2d 787
(1979).............................................................................. 22

**Articles**

"Continuing Education, PRSB Revocations Training" Allison
Bort................20

**Statutes**

ORS 183.482(8)...........................................................20, 31

ORS 161.385 (9) (c).......................................................20, 31

ORS 161.336...............................................................20

**OAR**

Oregon Security Review Board Administrative
Rule 859-510-0005.......................................................31

## IN THE COURT OF APPEALS OF THE STATE OF OREGON

## STATEMENT OF THE CASE

### Nature of the Proceeding

This is a Petition for Judicial Review of an Order from the Psychiatric Review Board (hereafter referred to as the "PSRB)), which resulted in the revocation of Petitioner's conditional release and committed her to the Oregon State Hospital pursuant to ORS 161.346 (1)(c). Review is governed by ORS Chapter 183.

### Nature of the Order

Petitioner seeks review of the Order by the PSRB that revoked her conditional release, found her under it's jurisdiction, denied her request for a community evaluation for possible conditional release placement, and committed her to the state hospital designated by the Oregon Health Authority for care, custody and treatment.

### Perfection of the Appeal

Appellant timely filed a Petition for Judicial Review on September 16, 2022 within 60 days of the Order being entered on July 27, 2022.

### Jurisdiction

This court has jurisdiction under ORS. 161.385(8).

### Questions Presented

1.)    Was there substantial evidence in the record to support revocation of conditional release?

2.)    Was there substantial evidence in the record to support a finding by the PSRB to show that Petitioner was not appropriate for a community evaluation for conditional release?

3.)    Did Petitioner have a qualifying mental disorder at the time of the hearing?

## Summary of Argument

There was insufficient evidence in the record to show that Petitioner's conditional release should be revoked. In addition there was insufficient evidence to support the PSRB's findings that Petitioner could not adequately be treated and controlled in the community. Because of this, a community evaluation for possible release should have been ordered.

## Summary of Facts

Marion County Circuit Court Judge David Leith placed Petitioner under the supervision of the Psychiatric Security Review Board (hereafter PSRB) on May 13, 2013, after having been found Guilty Except for Insanity of a charge of Burglary I and Unlawful Use of a Weapon. In 2001 she was convicted of assault I, after stabbing her then girlfriend. She was not under the supe4rvision of the PSRB at that time.

Petitioner has experienced three cycles of release to a community placement, followed by revocation.

She was in the hospital under PSRB jurisdiction from February 28, 2019 through April 5, 2022, at which point she was placed on conditional release to the Mental Health group home: Alternatives in St. Helens, administered by Columbia County. This placement lasted through May 4, 202.

The failed placement followed an incident were she purportedly walked out of the facility after being chastised for screaming. Petitioner was told by her designated supervisory agent, Ms. Schubert that she could not leave and would be reported. According to Ms. Schubert's letter, Petitioner turned back towards the facility and charged at the doorway in an angry and hostile manner. Per the letter, Ms. Shubert stepped behind a glass door and partially shut it and said "No" and Petitioner flipped her off and then walked away from the facility. (See Ex PSRB #13-2628 attached to this brief as Er 3 )

On September 30, 2022 Petitioner appeared before the psychiatric Review Board composed of Chair Anne Nichols; Julie Duke and Dr. Pamela Buchanan to determine whether her conditional release should be revoked. The Oregon Department of Justice was represented by Daniel Toulson and the patient was represented by Bailey Moody. Exhibits 1 through 503 were admitted over Ms. Moody's objections to hearsay. She objected to the following exhibits as hearsay: 480, 482, 483, 485, and 486. She specifically objected to

Amy Shubert's statements (Ex 483) being introduced as the witness was not present in court to judge her credibility and they were unreliable evidence. (Tr. 8-9) The attorney for the state argued the records were admissible under ORS 161.346(1) that the standard for admitting evidence in a PSRB hearing is in ORS 161.346(3) "All evidence of a type commonly reloaded upon by reasonably prudent persons in the conduct of their serious affairs shall be admissible at hearings." (Tr. 9) The Chair overruled her objection and admitted the exhibits, stating that it was the type of evidence the board would normally rely upon. (Tr. 11)

Pursuant to Ms. Moody's objection to the opinion of Ms. Schubert regarding legal conclusions as she is not an attorney, the Chair refused to strike her statements but noted for the record that they would admit it for whatever value it carries but that her opinion as to legal matters would be given little weight. (Tr. 11)

Ms. Moody refused to stipulate to grounds for jurisdiction. The State gave an opening statement. Mr. Toulson stated that revocation was appropriate because and that jurisdiction is based on the following: That Ms. Graves suffers from a qualifying mental disorder that when active causes her to be a substantial danger to others. (Tr. 12) He continued stating he objected to community evaluation or a release request as well. (Tr. 13)

Ms. Moody opened by stating there was more to the story than what was contained in the records concerning Ms. Grave's stay at Alternatives and that they were seeking an order from the Board denying the revocation or alternatively for a new conditional release to a less structured facility than she had at Alternatives. (Tr. 13) She drew the Board's attention to the letter submitted by Ms. Graves concerning the strife she suffered while at Alternatives, Exhibit 498. That it was the States burden to show Ms. Graves' conditional release should be revoked and alternatively that she would be presenting evidence that Ms. Graves met the criteria for conditional release. (Tr. 13)

The Chair called Dr. Simrat Sethi. Dr. Sethi was a staff psychiatrist who worked at the Salem Campus of the Oregon State Hospital on the Unit named Bridge-1. (Tr. 15) He was not presently her treating psychiatrist, he was her treating psychiatrist for a period of 18 months before she left on her conditional release to Alternatives. (Tr. 16) He also worked with her previously in his role on the risk review. He was no longer doing risk review work. (Tr. 15) He stated he had reviewed her documents in her file, specifically those submitted since her revocation. (Tr. 16)

Dr. Sethi stated that he knew why Petitioner had been revoked from her conditional release. He summarized the reason as: "She became increasingly

agitated and disruptive, was unable to participate in conversations, then left the facility without authorization...engaged in unauthorized release." (Tr. 16)

Ms. Moody established that the unauthorized release was no more than 24 hours and that the actual length of the leave was unclear to Dr. Sethi. (Tr. 16)

Dr. Sethi stated that he had tried to facility the success of the conditional release by reaching out to her prescriber and the Administrator at Alternatives and give them some advice about how to engage with Ms. Graves. He stated that he emphasized establishing a working relationship with her so that if conflict should arise, it could be resolved without resulting in a revocation. (Tr. 17) Later he received a call from the administrator and they explained to him that Ms. Graves was showing evidence of agitation, interpersonal conflict and inability to resolve issues they were having. (Tr. 17)

He stated that he described interventions to the Administrator that had worked before when Ms. Graves was on bridge 1, including having a safe space in her room, giving her time and addressing the issues she raised. (Tr.18) When asked whether or not those interventions had worked he said they had seemed not to.

When asked if there was evidence that Ms. Graves had become aggressive he stated that according to Exhibit 471 at page 2, "Ms. Graves was

very agitated and aggressive, verbally threatening Ms. Schubert and charged at her, and then ran out of the facility." (Tr. 18)

When asked what her current diagnosis was he stated, "Schizoaffective disorder bipolar type." (Tr. 19) When asked if while at the hospital she has been taking her medications, he responded that according to her chart she is on involuntary status. (Tr. 19) But that from Dr. Hall's recent notes she has been working with him to take her medications. (Tr. 19) He corrected himself to state Dr. Bell not Dr. Hall.

He was asked what Ms. Graves' symptoms are when she decompensates, and he responded, "When she decompensates she displays behavioral and verbal agitation, prosecutorial delusions, and previously at the state hospital had barricaded herself inside her room, leading to a reverse transfer. So agitation, paranoia, delusions of persecution, and reference, extreme suspiciousness, and agitation." (Tr. 19)…"She also refuses to take her medication and alleges side effects which seem excessive to those observed by staff." (Tr.20)

When asked based on his experience working with her and his review of her record whether or not she has engaged in substantially dangerous behavior when her mental health disorder was active, he responded that she has. (Tr. 20)

When asked whether or not he believed she was appropriately placed at the mental hospital and why, he responded: "My opinion is she's appropriately placed at the Oregon State Hospital based on the circumstances of her

revocation, how she presented upon admission, the need to resort to involuntary medications, and the fact that she continues to reside on Lighthose-3 in Harbors, which is the most staffed and secure part of the hospital. (Tr. 20)

When asked what treatment steps her team would need to complete before she could progress towards conditional release, he stated that they would need to have in place effective psychotropic drugs to address her mood instability and paranoia. (Tr. 20) That she would have to have a good working relationship with her IDT, (The treatment team) and that can be hard for Ms. Graves to engage in but she has done it successfully for her last three conditional releases. (Tr. 21)

That she needs to work with the treatment team to come up with a plan and present it to the risk review and work towards getting her some privileges. (Tr. 21) Then she would need to convince the community provider to consider her for conditional release. He stated that the more revocations a person has, the harder it is to proceed to a subsequent conditional release. (Tr. 21)

On Cross examination, Dr. Sethi stated that Ms. Graves conditional release began in early April and was revoked early May. (Tr. 25) He also stated he was no longer her treating psychiatrist. He had no information that she saw a doctor or treating psychiatrist while at Alternatives. (Tr. 26)

On cross examination Ms. Moody asked Doctor Sethi whether or not Ms. Graves was a transgender woman, and he answered yes. (Tr. 30) She also asked

him whether or not he knew of incidents were she was subjected to violence on the basis of being transgender and stated that yes she has. (Tr. 30) When asked if she has been discriminated against, he stated that she probably has. (Tr. 30) When asked he also stated he had told her not to bring up her beliefs about COVID, anti-vaccinations or masking as that might keep her from being accepted at a facility. (Tr. 30)

Dr. Buchanan asked if there were any medications changes from the time of her release from the hospital to Alternatives, and Dr. Sethi stated there had not been but she was scheduled for a doctor's appointment, but she was revoked prior to it. (Tr. 33)

Ms. Moody then called Dr. Ryan Bell. He stated that he is presently working as a psychiatrist at the state hospital in Salem. That he is working at Lighthouse 3 which is where Ms. Graves has been residing for the last month. He was asked if he was familiar with her record and he responded that he had read her Oregon State Hospital record. When asked if he was familiar with the exhibits, he responded, not all of them. He stated he had read her GEI file, which included the original assessment, police reports and her discharge summaries and progress reports. When asked if he read the documents from Alternatives, he stated he believed they were part of her GEI file which included the description of the events that lead to her return. (Tr. 37).

When asked what medications she was on he responded: "So Ms. Graves is currently on Bupropion, which is an antidepressant/anxiolytic. Also she is on Latuda which is a second generation antipsychotic to treat (indiscernible) But at this dose, she has a low dose, usually more for mood. And she's on Lamotrigine which is a mood stabilizing agent." (Tr. 37)

When asked what her medication compliance was since he has been working with her he responded:

"So initially, she was on a different regime and we revisited that and we went back to what she had been on prior when she had been discharged at the last time. And she's—she has not been taking the Lamictal consistently."(Tr. 37)

When asked if she was still on the involuntary medications, he responded that he has not changed that since he has been working with her. When asked if that meant she wasn't taking her medications he explained that no, what it means as that when she was admitted that was her stats and that it is paperwork, and has not done the paperwork yet to update it:

"No, It just means that she came in on an involuntary and I again, I just haven't done anything to change it there. You know, we can—we've been negotiating the meds. There hasn't been a, you know, big issue with it, so I just, again, I just haven't had occasion to go back and revisit the paperwork, so" (Tr. 38).

When asked whether he found her difficult to work with he responded that when he has met her he has found it really straight forward to work with

her, that she is quite frank but he does not mind that, that her previous worker were not working well together, the previous exhibits showed that Ms. Graves refused to speak to her, but that he got along with her fine. (Tr. 39) That is was fair to say that some staff find it very easy to work with her and some do not.

When asked how her behavior had been with him, he stated that it had been fine, that he has had no difficulties or conflicts or disrespect from her at all. That she has been respectful and straight forward and they work well together. (Tr. A39).

When asked whether or not she was currently presenting as verbally or behaviorally agitated, he responded that he has not seen that. He stated that he does know there are staff who do not work well with her, and there was verbal conflict, and they do have a very acute unit. (Tr. 40)

He also described the unit as having 18 patients and that some of them do not have any boundaries or inhibitions and behave inappropriately towards her, and that she has been verbally aggressive with them, but no more than other patients. (Tr. 40) That there is a lot of sexual inappropriateness with some of the clients. There have been instances were some of the patients have been physically intrusive towards Ms. Graves, approached her inappropriately while they were in the hall, not respecting her physical boundaries, where they had to intervene. (Tr. 40) They had to restrict some patients from the hallway because they kept going back to her room and trying to engage with her.

When asked if he ever witnessed her barricading herself in her room he said no. When asked if she has been treated differently because she is transgender, he responded that there are some patients who treat her inappropriately because she is female. (Tr. 41)

When asked if he believed she was a danger to the public he responded that he did not. (Tr. 41)

When asked what the most beneficial placement for Ms. Graves would be he responded that most people do not get into the state hospital due to a sole diagnosis of a personality disorder, that would exclude you from a GEI. That persons with any kind of a personality disorder involve a rigid response to stimulus. That it is the typical response to stress which often times leads to interpersonal difficulties. (Tr. 42) Persons with personality disorders do very poorly in a highly structured environment. That it is best practices to not hospitalize them for great lengths of time. If you take them out of that setting, then their behavior becomes much less problematic. (Tr. 44)

He stated that she was not benefiting from the present setting she was in and would do better in a less restrictive setting. (Tr. 45) He agreed with Ms. Moody that Ms. Grave's behavior was more driven by her personality style than by her psychiatric disorder. (Tr. 45) That in her case it is a very strong personality. "She has ...very strong ideas of what's right and what's wrong and how she wishes to be treated."(Tr. 46) He also stated that he has observed staff

who are successful in working with her approach her in a manner that asks her what is going on and what is the outcome you want, rather than the standpoint of this is what is going to happen. That it is a skill that takes a lot of trust and patience. (Tr. 46)

He also stated that she is not like the other 17 patients on the unit and does not have the symptoms that they do. He stated that just today there had been a recommendation to move her out of Lighthouse 3 to a less restrictive unit. (Tr. 46)

On cross he was asked if he agreed with Dr. Sethi's assessment that when Petitioner's mental disorder is active that she exhibits paranoia and is delusions, delusional ideation, perseverative thinking, anger and irritability?

He responded that he has not observed her to be delusional, and in regards to paranoia she is more suspicious than some, but that does not mean that things haven't happened to support some of her conclusions. (Tr. 49) That he has never observed anything unhinged from reality. He stated even in the notes, he has not seen anything completely delusional. (Tr. 49) In regards to aggression he stated that he has never observed her to pick fights or go out of her way to seek trouble, that when someone confronts her she reacts strongly. (Tr. 50)

When asked whether or not he agreed with her historic diagnosis of schizoaffective disorder bipolar type, he responded that based on the history

there is evidence of that. When asked if she was on medication for that disorder he stated, yes she is (Tr. 50)

He was asked about the incidents of violence in her record and he responded he was aware of them: The incident were she stabbed a partner was twenty years ago and she went to prison for it, there was also an incident where the police came and she locked herself in the bathroom and threatened to shoot them and then surrendered her gun, and there was an incident two evictions ago where she slapped another patient. (Tr. 51)

There was an incident most recently where she slapped a coke out of someone's hand, that it was written up as an assault but he does not see that as an assault. The person was verbally insulting her. (Tr. 51) He stated it is not the kind of thing where he would be gravely concerned about the ability of the person to be safe in the community. He stated that the instances need to be placed in context, and that in the past she had been using drugs heavily but that is no longer the case.

That in the last twenty years he saw no evidence of her using a weapon against anyone (Tr. 51)

The State gave it's closing argument. Mr. Toulson asked the Board to uphold the revocation, exhibit 472 based on the testimony of Dr. Sethi and the documented evidence. That Exhibit 472 has the affidavits and letter from Ms. Schubert outlining the reasons for revocation. (Tr. 54) That Ms. Graves

engaged in violent actions while symptomatic. That while Dr. Bell testified she
is not presently a danger, it is because she is on medications that control her
schizoaffective disorder. That she is not appropriate for conditional release
because she has to work her way through the floors at the hospital. (Tr. 54)

Ms. Moody closed: The state failed to show that jurisdiction is currently
appropriate or that it meets the criteria for jurisdiction under PSRB. Dr. Bell,
her treating psychiatrist testified that presently her primary diagnosis is not
schizoaffective disorder, but rather a personality disorder. That her behavior is
driven by her personality disorder which is not a grounds for jurisdiction. That
jurisdiction discharge is appropriate.

In regards to whether or not the conditional release should have been
revoked, the State failed to meet it's burden. There was little evidence of
regarding her actions. No one testified about her actions. They were relying on
statements made to second or third parties.

The testimony from Dr. Bell showed she was not presenting in the same
fashion that Dr. Sethi testified as to what others had told him. In addition Dr.
Bell indicated that the placement at Alternatives was not an appropriate
placement, nor was her present placement. That she does not do well in
placements where there are a lot of people around her, and that she needs to be
in a setting where she can take care of herself and be separated from other
people who are actively suffering from mental illness. (Tr. 57) Ms. Grave's

letter shows that the stay at Alternatives was a harrowing experience for her.
That it does not make sense to revoke someone from a placement where they
should not have been released to in the first place.

She should be evaluated for conditional release given how she is
currently conducting herself in the hospital, taking her medications and
behaving appropriately. (Tr. 59)

The Board found that she continued to be affected by a qualifying mental
disorder and posed a substantial risk of danger to others and that she was
properly placed back under the Board's jurisdiction. The revocation of her
conditional release was appropriate and there was evidence to support it. They
denied her request for an evaluation for conditional release.

## ASSIGNMENT OF ERROR 1

1.)    The **PSRB** erred, in revoking Petitioner's conditional release, because
there was not substantial evidence to support revocation.

### A. Preservation of Error

Petitioner's attorney argued in her closing argument that the evidence
was not sufficient to support revocation:

"Next, with regard to the issue of whether or not the release should have
been revoked. In reviewing the agreement to conditional release, there has been
very little, if any, solid evidence with regard to Ms. Graves' actions. There have
been some exhibits presented, but Ms. Graves renews her argument that the --

the information presented in those exhibits, as well as a paltry amount of

testimony that Mr. Sethi -- or Dr. Sethi was able to present did not meet the

level to which the Board would need to show that that is reliable information.

We have not heard directly from anyone who would testify regarding these

allegations.  There has been no ability for the Board to assess their credibility."

(Tr. 56)

The State argued that the Board should uphold the revocation based on

exhibit 472 and based on the testimony of Dr. Sethi and the documented

evidence. That Exhibit 472 has the affidavits and letter from Ms. Schubert

outlining the reasons for revocation. (Tr. 54) That Ms. Graves engaged in

violent actions while symptomatic. That while Dr. Bell testified she is not

presently a danger, it is because she is on medications that control her

schizoaffective disorder. That she is not appropriate for conditional release

because she has to work her way through the floors at the hospital. (Tr. 54)

The Court held:

"Drucilla Graves, without adequate supervision and treatment, would continue

to present a substantial danger to others as demonstrated by the underlying facts

shown by the evidence, including the expert evidence of Simrat Sethi, M.D., at

the hearing.  First, the Board finds that there has not been any evidence

contradicting the findings of fact contained in its very recent Commit Order

dated March 31, 2022, and, therefore, incorporates by reference those findings

of fact in Section 3 of that order. The Board considered the expert testimony of

Ryan Bell, M.D., at the present hearing, who indicated that Ms. Graves is not

dangerous at this time. However, the Board finds that this opinion is limited by

the short length of time Dr. Bell has worked with Ms. Graves and his reported

unfamiliarity with the entirety of the record. In addition, Dr. Bell's opinion is

inconsistent with multiple other recent and historical opinions and evidence in

the record opining on Ms. Graves' dangerousness toward others when her

qualifying mental disorder is active."

"For example, looking at the record since Ms. Graves was admitted to the

hospital, the information contained in the Psychiatric Admission Assessment,

authored by James Peykanu, M.D. states, Ms. Graves is admitted today on

revocation of her conditional release to Columbia County and is highly irritable

and uncooperative. In past episodes she has had a significant increase and

violence and aggression risk related to symptoms when she has presented

similarly, and medications are highly effective at mitigating this risk for her.

Initial involuntary treatment to continue her medications is necessary to prevent

worsening of condition and increase risk of aggression toward peers and staff in

the short-term." (Commit Order Page 4)

## B. Standard of Review

In order to be sustained on appeal, ORS 183.482(8)(c) requires that the PRSB's

findings be supported by substantial evidence in the record.

PETITIONER'S OPENING BRIEF AND EXCERPT OF RECORD                    18

## Argument

The evidence in the records presented by the state was that while on conditional release, Petitioner got into a dispute with a staff member at Alternatives, which is a community placement and charged at her. There was no evidence of her actually hitting anyone or threatening to hit them. This evidence fell short of what would be required for a reasonable person to conclude that Petitioner was dangerous at the time her release was revoked.

Pursuant to ORS 161.336(1), when a defendant is found not responsible due to mental disease or defect, ORS 161.319, and the court finds by a preponderance of the evidence that the person is affected by a mental disease or defect and presents a substantial danger to himself or others requiring that he be committed to a state mental hospital or conditionally released, the court must order him placed under PSRB jurisdiction for care and treatment.

The Board may order conditional release if it finds that the person presents a substantial danger to himself or others but that he or she can be adequately controlled with supervision and treatment on conditional release, and that such supervision and treatment are available. ORS 161.336.(2)

Under ORS 161.336(6), if a person violates the terms of his or her conditional release or it appears to the Board or its chairman that the person's mental condition has changed, the board or its chairman may order the person's return to a state mental hospital for evaluation or treatment.

Under ORS 161.336(4) a revocation of a conditional release plan is by a hearing before the PSRB and it results in the client being returned to the Oregon State Hospital. The Board applies a reasonableness standard. It is a last resort intervention to be used when a client cannot be safely maintained in the community. (CE PRSB Revocation Training, presented by Allison Bort at https://www.oregon.gov/prb/Documents/2021-06-25%20PSRB%20Refresher%20Revocation.pdf)

Ms. Bort suggested alternatives to revocation which included short term placement at a mental hospital, reducing someone's privileges or moving them to a more restrictive/ secure placement. None of that was considered for Petitioner.

ORS 161.336 is the statutory authority for revocation:

**ORS 161.336 Conditional release by board; order for return; termination or modification of conditional release; hearing.**

ORS 161.336(4) (a)(B)

"An order described in this paragraph (order revoking conditional release) may issue when the supervising entity, the authorized designee or, if the person has absconded the community mental health program director, has determined that:

(i) The person has violated the terms of conditional release; or

(ii) the mental health of the person has changed such that the supervising entity or if applicable, the authorized designee or the community mental health program director, reasonably believes that the person may no longer be fit for conditional release."

After a hearing, the Board has two options: it may order the continuation of conditional release, or it may order commitment to a state mental hospital if it finds that the person is affected by mental disease or defect, presents a substantial danger to himself or others, and cannot be adequately controlled on conditional release. The state must prove the above elements by a preponderance of the evidence.

In the case at bar the Board revoked Petitioner's Conditional Release based on Ms. Schubert's letter stating that her behavior was disruptive while at Alternatives; her refusal to follow rules; frightening Ms. Schubert by charging at her; and absconding. The Board entered findings that Petitioner was *affected by a mental disorder and presented a substantial danger to herself or others and that the authorized designee reasonably believed that she could not be maintained safely in the community.* The facts in the record were insufficient to support these findings by a preponderance of the evidence.

The facts included that Petitioner took over meetings and was disruptive. She went to a common area and screamed and when reprimanded by Ms. Shubert, her designated supervisor agent, she walked out the door. Ms. Shubert ordered her to come back and threatened to report her, and she turned back and charged at the door, at which time Ms. Schubert stepped behind it and said, "No." partially shutting the door. This does not rise to the level of a preponderance of evidence that Petitioner was affected by a mental disorder and

presented a substantial danger to herself or others. It is not objectibly reasonable for the authorized designee to find that Petitioner could not be safely maintained in the community based on this information. Rather this evidence shows that Petitioner was disruptive and not welcome at the facility because she refused to follow rules and she was confrontational when she perceived herself as being disrespected.

The revocation happened in early May and the hearing was in July almost three months later. Dr. Bell, Petitioner's treating psychiatrist testified that he did not believe Petitioner was a danger to the community. He testified she was cooperating with medications and that they changed her medications back to what they had been before she was conditionally released. He testified that she did not belong on Lighthouse Three and that OSH was moving her from that unit. He stated that all the other persons on the unit had psychiatric symptoms. She stated she was not aggressive.

In Cardwell v. Psychiatric Security Review Board, 38 Or. App. 565, 590 P2d 787 (1979) the facts were similar. In Caldwell an anonymous called reported that Caldwell was suicidal to the police. Based on this, the Board revoked his conditional release and entered the following findings:

1.) That John Caldwell presented a substantial danger to self or others. That he could not be adequately controlled in the community or supervised if

conditionally released into the community. On appeal, the Court held that this evidence was insufficient.

The Court of Appeals recognized that while Caldwell was hospitalized in the interval from the revocation and the hearing he was not presenting as suicidal, there was no indicia of reliability regarding the anonymous call and Caldwell's friend had testified he was not suicidal, rather he was gentle and not a threat to anyone.

The case at bar is similar. The evidence was not substantial in Caldwell when a unanimous caller said he was suicidal. Likewise in the case at bar, the evidence is not substantial enough to show danger to self or others when the supervising agent, reported Petitioner for charging at a door. The evidence shows that Petitioner was not cooperative with rules and was making a nuisance of herself, but it did not show she was dangerous.

In the case at bar, Petitioner's treating psychiatrist at the State Hospital, Dr. Bell testified that he believed that Petitioner was more affected by her personality disorder rather than any psychosis. (Tr. 41) He also did not believe she was presently a danger to herself or others. (Tr. 41) He felt that while on the ward for the last 30 days, she had been provoked and that her behavior was appropriate response to those provocations. He also believed she had a difficult time being placed where there are so many rules she would be required to adhere to due to her personality disorder.

In Ms. Schubert's letter it stated that Petitioner argued with staff about whether or not they should wear masks due to COVID, she commandeered a meeting, and she pushed the limits of her privileges and when told she could leave the facility for one hour, she left for three hours. She said she was looking for a job but according to Ms. Schubert she had not been given clearance yet to look for a job. The final incident which caused Ms. Schubert to ask for revocation was that Petitioner let out a scream in the common area and when questioned about it, refused to admit she had done it, she walked out the door of the facility when told she cannot behave that way and Ms. Schubert called after her that she had better come back or she would be in violation.

Petitioner turned back towards the facility and charged towards the two doors. There appears to be a glass door with a breezeway and a second glass door to the outside. The letter is not clear but it would appear that Ms. Schubert was calling to Petitioner from the breezeway and when Petitioner turned Ms. Shubert stepped back behind the door to the outside into the breezeway and when Petitioner started to rush towards the door, Ms. Shubert stepped behind the second door, entering the facility and closing the door to Petitioner and mouther the word, "No." Because Ms. Schubert never testified we do not know how reliable her description is of what happened, but it appears that Petitioner was told not to enter the facility at that point and she turned around and left

retuning outside. This is not absconding, rather this is being shut out of the facility.

It appears from the record that Petitioner can be difficult, has a domineering personify and reacts strongly when she perceives herself as being reprimanded or disrespected. However, the record falls short of establishing that she was a danger to herself o· others or that she absconded.

Revocation of conditional release is a drastic measure and curtails the freedom from the State Hospital that Petitioner worked hard to earn. Rather than revocation, Petitioner should have been given a short term voluntary stay at a mental hospital to come back to baseline or until another perhaps more secure placement could be found.

The affidavit in support of revocation can be found at page 4282 of the PSRB's exhibits and is from May 2022, just after Petitioner's admission to OSH. In it the Affiant, a para legal, stated in his opinion, after review of the records that revocation was appropriate: That presently her symptoms were active so she was a danger to others:

> She has a qualifying disorder, Schizoaffective Disorder. When symptoms of this disorder are active, she is at risk of harm to other people. At the time of admission, revocation of conditional release was appropriate given the significant increase in symptoms and difficulty managing them in the outpatient setting. It is unlikely that stabilization of these symptoms is achievable within the time frame prior to her initial revocation hearing within 3 weeks such that conditional release would likely be resumed quickly. PRSB 13-2628, Ex 476, Pages 3-4

However this evidence is overshadowed by the testimony of Petitioner's treating psychiatrist, Dr. Best. He treated Petitioner for those four weeks prior to her hearing at Lighthouse 3, and his perceptions were closer in time to the date of the hearing and there for a more accurate perception of her existing condition at that point in time:

He testified that he has not observed her to be delusional, and in regards to paranoia she is more suspicious than some, but that does not mean that things haven't happened to support some of her conclusions. (Tr. 49) That he has never observed anything unhinged from reality. He stated even in the notes, he has not seen anything completely delusional. (Tr. 49) In regards to aggression he stated that he has never observed her to pick fights or go out of her way to seek trouble, that when someone confronts her she reacts strongly. (Tr. 50)

He also testified she was cooperating with him with taking her medications and they went back to what she was taking before she was conditionally released to Alternatives. In his opinion she was not a danger to the community (Tr. 41) He stated that her behavior was more driven by her personality disorder than any psychosis. (Tr.46) He testified they were moving her to a less restrictive unit (Tr.44) and that the State Mental Hospital was a too restrictive placement for her. (Tr. 44)  On cross he did recognize she had a historic diagnosis for a schizo-affective disorder but presently he did not see that. (Tr. 41, 50, 46)

On cross he was asked if he agreed with Dr. Sethi's assessment that when her mental disorder is active and that she exhibits paranoia; is delusional; has delusional ideation; perseverative thinking; anger and irritability. He responded that he has not seen any indication that she is delusional and he has not experienced her to be aggress've (Tr. 46, Tr. 50) That her behavior was more driven by her personality disorder.

He was not too concerned about her acting out violently and testified it had been over twenty years since the incident were she had stabbed her girlfriend. He saw her reactions as within the bounds of appropriate and the result of being provoked while on the ward this last month.

From the record it appears that by the time of the hearing Petitioner was at baseline. She was struggling with the rules at Alternatives and was not getting along well with staff. Commandeering a meeting, being vocal about not wanting anyone to wear masks, arguing with staff and leaving the building after being chastised for screaming, then threatened there would be consequence unless she came back, followed by shutting the door in her face because she ran at the entrance, does not rise to the level of a preponderance of evidence that Petitioner was a substantial danger to others.

Alternatively, by the time of the hearing her condition had stabilized back to baseline and her conditional release should not have been revoked.

### Assignment of Error 2

2.)    The **PSRB** erred, in denying Petitioner a request for an evaluation, by finding that Petitioner could not be adequately controlled and treated in the community on conditional release

## A. Preservation of Error

Petitioner's attorney argued in her closing argument that Petitioner should be given an evaluation and could be safely treated in the community. (Tr. 56)

The State argued that the Board should uphold the revocation based on exhibit 472 and based on the testimony of Dr. Sethi and the documented evidence. That Exhibit 472 has the affidavits and letter from Ms. Schubert outlining the reasons for revocation. (Tr. 54) That Ms. Graves engaged in violent actions while symptomatic. That while Dr. Bell testified she is not presently a danger, it is because she is on medications that control her schizoaffective disorder. That she is not appropriate for conditional release because she has to work her way through the floors at the hospital. (Tr. 54) The Court held:

"The Board considered the expert testimony of Ryan Bell, M.D., at the present hearing, who indicated that Ms. Graves is not dangerous at this time. However, the Board finds that this opinion is limited by the short length of time Dr. Bell has worked with Ms. Graves and his reported unfamiliarity with the entirety of the record. In addition, Dr. Bell's opinion is inconsistent with multiple other

recent and historical opinions and evidence in the record opining on Ms. Graves' dangerousness toward others when her qualifying mental disorder is active."...

" For example, looking at the record since Ms. Graves was admitted to the hospital, the information contained in the Psychiatric Admission Assessment, authored by James Peykanu, M.D. states, Ms. Graves is admitted today on revocation of her conditional release to Columbia County and is highly irritable and uncooperative. In past episodes she has had a significant increase in violence and aggression risk related to symptoms when she has presented similarly, and medications are highly effective at mitigating this risk for her. Initial involuntary treatment to continue her medications is necessary to prevent worsening of condition and increase risk of aggression toward peers and staff in the short-term." (Commit Order Page 4)

### B. Standard of Review

In order to be sustained on appeal, ORS 183.482(8)(c) requires that the PRSB's findings be supported by substantial evidence in the record. The Court also reviews to make sure the findings are not inconsistent with specific provisions relating to the Board's authorizing statutes under ORS 183.482(8) a-d and ORS 161.385 (9)(c).

### Argument

By the time of the hearing Petitioner's condition had stabilized. The record shows that she was taking her medication, and it was her treating psychiatrist's opinion that she was not a danger to the community. It was also his opinion that she was not experiencing any delusions and that her behavior was more a result on her personality disorder. That presently she was not acting out aggressively unless provoked and her responses were appropriate. It was also his opinion that the placement at the Oregon State Hospital was too restrictive for her and that her history of violence was over twenty years ago. (See Tr. 48 to 50) and those arguments set out in assignment of error one.

### Assignment of Error 3

2.)    The **PSRB** erred, in finding there was jurisdiction: Petitioner no longer had a qualifying mental disorder and a jurisdictional discharge was appropriate.

**A. Preservation of Error**

**Ms. Moody argued:** The state failed to show that jurisdiction is currently appropriate or that it meets the criteria for jurisdiction under PSRB. Dr. Bell, her treating psychiatrist testified that presently her primary diagnosis is not schizoaffective disorder, but rather a personality disorder. That her behavior is driven by her personality disorder which is not a grounds for jurisdiction. That jurisdiction discharge is appropriate. (Tr. 56)

The attorney for PSRB argued that while Dr. Bell testified she is not presently a danger, it is because she is on medications that control her

schizoaffective disorder. That she is not appropriate for conditional release because she has to work her way through the floors at the hospital. (Tr. 54)

The trial court agreed with the attorney for the PSRB. (Tr. 58)

## B. Standard of Review

In order to be sustained on appeal, ORS 183.482(8)(c) requires that the PRSB's findings be supported by substantial evidence in the record. The Court also reviews to make sure the findings are not inconsistent with specific provisions relating to the Board's authorizing statutes under ORS 183.482(8) a-d and ORS 161.385(9)(c). The burden of proof is on the Petitioner to show by clear and convincing evidence for dismissal of jurisdiction.

## Argument

It was her treating psychiatrist's opinion that Petitioner was not experiencing any delusions and that her behavior was more a result on her personality disorder. That presently she was not acting out aggressively unless provoked and her responses were appropriate. It was also his opinion that the placement at the Oregon State Hospital was too restrictive for her and that her history of significant violence was over twenty years ago. See (Tr. 41 to 50) and those arguments set out in assignment of error one and two.

Oregon Psychiatric Security Review Board Administrative Rule 859-510-0005, Definitions:

**(10)**

"Qualifying Mental Disorder" (formerly "Mental disease or defect") means:

PETITIONER'S OPENING BRIEF AND EXCERPT OF RECORD                    31

**(a)**

that which is manifested by developmental delay or disability if a mental deficiency exists concurrently with qualitative deficits in activities of daily living and is not otherwise attributable to mental illness or substance abuse or influenced by current situational trauma; or

**(b)**

any diagnosis of mental disorder which is a significant behavioral or psychological syndrome or pattern that is associated with distress or disability causing symptoms or impairment in at least one important area of an individual's functioning and is defined in the current Diagnostic and Statistical Manual of Mental Disorders (DSM 5) of the American Psychiatric Association.

**(11)**

The term "qualifying mental disorder" does not include an abnormality manifested solely by repeated criminal or otherwise antisocial conduct; nor constituting solely a conduct or a personality disorder; nor solely an alcohol or drug abuse or dependence diagnosis. At the time of the hearing, Petitioner's behavior was a result of her personality disorder rather than any "diagnosis of mental disorder which is a significant behavior or psychological syndrome of pattern associated with distress or impairment in functioning"

The definitions at (11) state specifically that qualifying mental disorder does not include an abnormality manifested by repeated criminal or otherwise antisocial conduct; nor constituting solely a personality disorder.."

Alternatively, both the PSRB and the Defense agreed her condition had stabilized. This evidence shows if she has a mental disorder, that it was under control with medications, her medications had been adjusted back to what they were before her release, she was cooperating with taking her medications and that presently she was eligible for a new evaluation and conditional release.

## **CONCLUSION**

For the reasons stated above, the Psychiatric Security Review Board's

Order should be revered, with instructions to administrative review the record

established at the hearing and issue a new finding based on that record.

Alternatively jurisdiction should be dismissed as Petitioner no longer has a

qualifying mental disorder.

Respectfully Submitted this 20th day of December, 2022.

s/Liza Langford
Liza Langford OSB 882509
Attorney at Law
Attorney for Petitioner

# EXCERPT OF RECORD

## NOTICE OF FILING AND PROOF OF SERVICE

I certify that on December 20, 2022, I filed this Appellant's Brief and

Excerpt of Record with the Appellate Court Administrator, Appellate Court

Records Section, by using the court's electronic filing system.

I further certify that on December 20, 2022 I served this Appellant's

Brief and Excerpt of Record on Solicitor General Benjamin Gutman, attorney

for Respondent State of Oregon, by using the court's electronic filing system.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the word-count limitation of ORAP

5.05(2), and that, as specified in ORAP 5.05(2)(a)(ii)(A), the count of this brief

is 8275 words. I further certify that the size of the type in this brief is not

smaller than 14-point for both the text of the brief and footnotes as required by

ORAP 5.05(4)(f).

s/Liza Langford
Liza Langford, OSB 882509
Attorney at Law
PO Box 96302
Portland, Or. 97296
Phone: (503) 274-9070
ljanelaw@yahoo.com

1

BEFORE THE PSYCHIATRIC SECURITY REVIEW BOARD

2

OF THE STATE OF OREGON

3 | In the Matter ) PSRB No. 13-2628
) OSH PatID No. 82247
4 | of ) Marion County No. 12C46930
)
5 | EDWARD WAYNE SCHNEE aka ) COMMIT ORDER
DRUCILLA RAMONA GRAVES )

6

7        This matter came before the Psychiatric Security Review Board on July 13, 2022, for a

8  hearing pursuant to ORS 161.336(4)(d). Board members present via video were Pamela

   Buchanan, Psy.D., Julie Duke, and Anne Nichol, J.D., Acting Chair. Drucilla Graves was
9
   present with her attorney, Bailey Moody, via video from the Oregon State Hospital (OSH);
10
   Assistant Attorney General (AAG) Daniel Toulson was present via video representing the State.
11
   The burden of proof as well as the bu den of going forward was on the State.

12       Prior to taking opening statements, Acting Chair Nichol reminded the parties that any

13  protected information contained in the record or submitted to the Board is subject to the

14  Protective Order which is contained in the Board's Exhibit 449.

15       As a preliminary matter, AAG Toulson objected to the Board admitting portions of

16  Exhibit 503, arguing the author of that note, Ryan Bell, M.D., a psychiatrist, did not have the

17  requisite expertise to opine on the legality of Ms. Graves' underlying offense and further argued

18  that Dr. Bell's interpretations of the law were incorrect. In response, Attorney Moody believed

    that there was some legal basis for challenging Ms. Graves' underlying offense, noting that she
19
    understood that such challenge was not an issue at today's hearing. Chair Nichol overruled the
20
    objection based on the low threshold by which the Board admits exhibits, stating that the Board
21
    would admit Exhibit 503 for whatever value it carries, noting that in a case of a legal opinion,
22
    such weight would be very limited.
23

24       As a preliminary matter Attorney Moody objected to the Board admitting Exhibits 480,

    482, 483, 485, and 486. With respect to Exhibit 480, Attorney Moody argued that the document
25
    lacked foundation. Chair Nichol overruled this objection, stating that given the nature of the
26

Page 1 - COMMIT ORDER - EDWARD WAYNE SCHNEE aka DRUCILLA RAMONA GRAVES        ER 1

1    exhibit, foundation has been laid in light of the record in its entirety, and invited Attorney Moody
2    to question witnesses about the exhibit.

3         With respect to Exhibits 482, 483, 485, and 486, Attorney Moody objected to the
4    introduction of any statements made by Amy Schubert contained therein.   Attorney Moody
5    indicated that the State-burden nature of the case required the State to arrange Ms. Schubert's
6    presence at today's hearing.  She further argued that the absence of Ms. Schubert at the hearing
7    significantly disadvantages Ms. Graves in that it impairs defense's ability to present a
8    comprehensive defense through the cross-examination of Ms. Schubert, and it also impairs the
9    Board's ability to weigh Ms. Schubert's credibility.  Attorney Moody further indicated that this
10   argument extends to the statements Ms. Schubert made in those exhibits regarding what she
11   heard from others, who were also not listed as witnesses.  Attorney Moody concluded that Ms.
12   Schubert's statements are unreliable, per se, because she is not available for her credibility to be
13   assessed.  In response, AAG Toulson cited ORS 161.346(3) stating, "All evidence of a type
14   commonly relied upon by reasonably prudent persons in the conduct of their serious affairs shall
15   be admissible at hearings."   AAG Toulson further cited precedent that the State does not
16   typically arrange witnesses for PSRB hearings, noting that either party has the ability to arrange
17   for any witness they deem necessary to attend. Notwithstanding Ms. Schubert's absence, AAG
18   Toulson concluded that he believed Exhibits 482, 483, 485, and 486, met the standard contained
19   in ORS 161.346(3).  AAG Toulson added that he would not object to a continuance so long as
20   defense was in agreement given the statutory timelines associated with a revocation hearing.
21   Attorney Moody clarified that she would object to a continuance.  Chair Nichol overruled the
22   objection based on the standard for admitting evidence contained in ORS 161.346(3).

23        In his opening statement, AAG Toulson urged the Board to find the revocation and
24   jurisdiction appropriate, and he objected to any conditional release options, including ordering a
25   conditional release.  In her opening statement, Attorney Moody requested the Board find the
     revocation was inappropriate, and that the Board grant a discharge, or in the alternative that Ms.
     Graves be conditionally released.

The Board, having heard testimony and having received five hundred three exhibits, with the objections addressed at the outset of the hearing, excluding any designated victim impact statements, and after considering all the evidence admitted on the record, FINDS AS FACT that:

1.  Drucilla Graves was found guilty except for insanity of the crime of Burglary I and Unlawful Use of Weapon-Firearm and was placed under the jurisdiction of the Psychiatric Security Review Board for a maximum period of time not to exceed 20 years by Marion County Circuit Court Judge David Leith on May 13, 2013.

2.  Drucilla Graves is affected by a qualifying mental disorder as demonstrated by the underlying facts shown by the evidence. The Board finds that there has not been any evidence contradicting the findings of fact contained in its very recent Commit Order dated March 31, 2022, and, therefore, incorporates by reference those findings of fact in section 2 of that order. Further supporting this finding is the expert testimony of Ryan Bell, M.D., Ms. Graves current prescriber at the Oregon State Hospital, as well as his progress note dated June 29, 2022, stating that "Ms. Graves has a current diagnosis of Schizoaffective Disorder, Bipolar Type," as found in Exhibit 503. Dr. Bell testified that Ms. Graves is currently prescribed psychotropic medication to manage her qualifying mental disorder, including an antipsychotic, an antidepressant, and a mood stabilizer. This finding is further supported by the testimony of Simrat Sethi, M.D., at the hearing, who served as Ms. Graves' previous prescriber at the Oregon State Hospital for approximately eighteen months leading up to Ms. Graves' recent conditional release to Alternatives Residential Treatment Facility on April 5, 2022. Dr. Sethi testified that when Ms. Graves' decompensates, she presents with behavioral and verbal agitation, persecutory delusions, paranoia, and extreme suspiciousness. Dr. Sethi further testified that thereafter, she refuses medications and alleges side effects that seem excessive to those observed by staff. This finding is further supported by the additional medical records and reports since Ms. Graves recent admission to the Oregon State Hospital on May 4, 2022, as found Exhibits 482, 485, 487, 488, 489, 490, 491, 493, 494, 496, 501, 502, authored by at least five separate mental health professionals and all of which contain a qualifying mental disorder.

3.  Drucilla Graves, without adequate supervision and treatment, would continue to present a substantial danger to others as demonstrated by the underlying facts shown by the evidence, including the expert evidence of Simrat Sethi, M.D., at the hearing. First, the Board finds that there has not been any evidence contradicting the findings of fact contained in its very recent Commit Order dated March 31, 2022, and, therefore, incorporates by reference those findings of fact in Section 3 of that order. The Board considered the expert testimony of Ryan Bell, M.D., at the present hearing, who indicated that Ms. Graves is not dangerous at this time. However, the Board finds that this opinion is limited by the short length of time Dr. Bell has worked with Ms. Graves and his reported unfamiliarity

with the entirety of the record. In addition, Dr. Bell's opinion is inconsistent with multiple other recent and historical opinions and evidence in the record opining on Ms. Graves' dangerousness toward others when her qualifying mental disorder is active. For example, looking at the record since Ms. Graves was admitted to the hospital, the information contained in the Psychiatric Admission Assessment, authored by James Peykanu, M.D. states,

> Ms. Graves is admitted today on revocation of her conditional release to Columbia County and is highly irritable and uncooperative. In past episodes she has had a significant increase and violence and aggression risk related to symptoms when she has presented similarly, and medications are highly effective at mitigating this risk for her. Initial involuntary treatment to continue her medications is necessary to prevent worsening of condition and increase risk of aggression toward peers and staff in the short-term.

Similarly, Dr. Bell's opinion is inconsistent with the information contained in Ms. Graves' most recent treatment plan dated June 13, 2022. As explained in Problem 1 of that plan,

> Ms. Graves' continues display (sic) psychotic symptoms and behavior; e.g., has been seen actively responding to unseen others, expressing paranoia and suspicsiousness (sic) toward others and their intent in interactions, she has been aggressive toward staff and peers which resulted in one seclrdion (sic) event to maintain safety. She has been uncooperative with staff attempts to help her; e.g., refuses to meet with clinicians and is demanding thing we cannot due when she does. She has been medication non-compliance; e.g., engaging in medication purging and diversion thus was placed on a medication sit/ lockout. She has poor insight into her mental illness and need for treatment.

Indeed, Ms. Graves' dangerousness toward others appears to be regarded as of such concern that Ms. Graves currently resides on a unit that provides the highest number of staff and is the most secure part of the hospital. In addition, Ms. Graves' psychiatric stability and risk of dangerousness to others was compromised to the extent that the hospital initiated emergency medication and involuntary medication protocols, the latter of which remains in place. In the context of this evidence, the Board finds that to the extent, if any, that Ms. Graves can be considered not a substantial danger to others, it is due to the ameliorating influences resulting from the supervision, treatment, and medication she is provided by virtue of the Board's jurisdiction and by her current commitment to the Oregon State Hospital.

This finding is further supported by the history and circumstances related to Ms. Graves' current and past revocations. As the record demonstrates, each time Ms. Graves has been conditionally released to a lower level of care in the community

setting, all of which have been residential treatment homes or facilities, she has been revoked following the onset of mental health systems, and thereafter, exhibits verbally and/or physically threatening behaviors as described in Exhibits 146, 280, 366, and 471. The Board further notes that each time Ms. Graves has been conditionally released, the length of time she can safely maintain in each placement has progressively decreased.

This finding is further supported by the circumstances surrounding the crimes of Burglary I and Unlawful Use of Weapon-Firearm, for which Ms. Graves was placed under the jurisdiction of the Psychiatric Security Review Board, as described in the police reports contained in Exhibit 12, as well as her extensive criminal history, contained in Exhibit 268. This finding is further supported by the most recent documentation of dangerous behavior as well as opinions regarding Ms. Graves' risk of dangerousness as contained in Exhibits 471, 474, 476, 482, 485, 488, 491, 494, 496, 499, and 502.

4.    The State sustained its burden of proving by a preponderance of the evidence that Ms. Schnee continues to be affected by a qualifying mental disorder and continues to be a substantial danger to others and that she should not be discharged from the jurisdiction of the Board.

5.    The Board finds that the basis of the revocation of Ms. Graves' conditional release on May 4, 2022, was proper based on the information contained in the PSRB Affidavit in Support of Order for Revocation, dated May 3, 2022, as well as the information contained in the CCMH Revocation Letter authored by Amy Schubert, QMHP, who had been designated by the Board as having primary reporting responsibilities while Ms. Graves was on conditional release (Exhibits 471 and 483). The Board notes that, in light of the entirety of the record, it has had ample opportunity to assess Ms. Schubert's reliability, most recently during Ms. Graves' hearing on March 9, 2022, whereby Ms. Schubert's testimony and written documentation was relied upon to approve Ms. Graves for conditional release. Further, the Board finds that it could rely on the information Ms. Schubert reported to agency staff to develop the Affidavit in Support the Order for Revocation as well as the written documents she authored to support its findings of fact in the absence of live testimony from Ms. Schubert at this hearing. The Board further notes that it provided the parties a docket in advance with the witnesses the Board planned to make available at the hearing and that either party could have requested the Board to arrange for Ms. Schubert's appearance as a witness if it was deemed necessary.

6.    Drucilla Graves could not be adequately controlled and treated in the community if she were conditionally released at this time based on the expert testimony of Simrat Sethi, M.D., at the hearing, who stated that Ms. Graves,

is appropriately placed at the hospital based on the circumstances of her revocation, how she presented on admission, the need to resort to

involuntary medications, and the fact that she continues to reside on Lighthouse 3.

In light of this finding, the Board denies Ms. Graves' request to order a community evaluation at this time. The Board carefully considered the expert testimony of Ryan Bell, M.D., at the hearing, opining that Ms. Graves would be much better served in a less restrictive environment due to her personality factors. Indeed, the Board considered and took seriously similar arguments as well as the expert testimony provided by Simrat Sethi, M.D., during Ms. Graves' conditional release hearing on March 9, 2022. The Board recognizes and makes efforts to account for the personal welfare of the clients under its jurisdiction as required by ORS 161.336(1)(a). Notably, Ms. Graves skipped over the secure residential treatment facility level of care each of the four times she has been granted a conditionally release, illustrating the Board's attempts to consider her personal welfare. However, the Board finds that it must also consider conditions that are in the best interests of justice and the protection of society, and therefore, denies the request for evaluation to a lower level of care in the community at this time.

The Board CONCLUDES AS A MATTER OF LAW that:

1.  There were reasonable grounds to revoke Drucilla Graves' conditional release on May 03, 2022.

2.  Drucilla Graves, being affected by a qualifying mental disorder which, when active, renders her a substantial danger to others, is under the jurisdiction of the Psychiatric Security Review Board.

3.  Drucilla Graves is not a proper subject for conditional release because she could not be adequately controlled and treated in the community, and therefore, it would not be in the best interest of justice and the protection of society to release her at this time.

IT IS HEREBY ORDERED, pursuant to ORS 161.346(1)(c) and 161.351(2) that Drucilla Graves be continued in commitment at a state hospital designated by the Oregon Health Authority for care, custody, and treatment.

This order may be appealed pursuant to ORS 161.348.

DATED this ____ day of _____, 2022.

_____
Psychiatric Security Review Board Member

ER-6



May 5, 2022

Alison Bort, J.D., Ph.D.
Psychiatric Security Review Board
610 SW Alder Street #420
Portland, OR 97205
Fax #503-224-0215



RECEIVED

MAY 0 6 2022

P.S.R.B.

Re:  Edward Wayne Schnee aka Drucilla Ramona Graves

Dear Dr. Bort,

The contributing factors to Ms. Graves's revocation are somewhat elusive due to the complexity of Ms. Graves's mental illness. Ms. Graves was revoked almost a month to the day of her arrival. During that month, Ms. Graves immediately began to push the boundaries of the rules of her conditional release and Alternatives. Within a few days of arrival, Ms. Graves began started asking to go to her storage unit to acquire some of her belongings. Ms. Graves was clearly instructed by myself and her QMHA she was to only retrieve a few things. Ms. Graves was told there would be other opportunities to get more things. Ms. Graves was transported there while on a shopping trip with other residents. Ms. Graves disregarded this instruction and instead loaded up the transport van with many boxes and a large TV.

Arriving back at the facility and being made aware of what happened Ms. Graves was instructed to bring all items into the group room so they could be searched the next day. Two weeks later Ms. Graves was raised to a C-1 level and was allowed to leave for 1 hour a day to go for a walk or run an errand. After a session where work search was discussed briefly at the end of the session Ms. Graves was informed that job search time is not counted against the one hour out. This conversation was not permission to start looking for work but just a preliminary conversation about how work search does not count against time out of the facility.

Ms. Graves on the following Friday during the noon med window informed staff, she would be going to look for a job. While passing medications staff tried to address her and ask questions verifying what job and where she would be going Ms. Graves did not respond and left the facility. Ms. Graves left at 1:30 PM and did not return until 3:15. This was addressed the following Monday and it was made clear moving forward any job searches would be pre-arranged and there would be a clear plan in place prior to any job searches.

During the month, Ms. Graves was having conflict with other residents and was becoming manic around that and when the team would try to address the situation her ability to track a conversation was getting worse. Ms. Graves would jump from point to point, would not allow staff address any of her concerns or would interrupt and state why staff was wrong when addressing concerns.

Ms. Graves also began to express a need to control the team and this was quickly becoming unmanageable. Ms. Graves would try to direct the team to not wear their mask required by staff of residential treatment facilities due to COVID. Ms.Graves was telling staff not to gesticulate because it made her afraid, and then would tell the same staff not to put their hands in their pockets. Ms. Graves was reporting her belief that staff computers, phones and I watches were recording her.

E R-b

During her month at Alternatives Ms. Graves began to walk into the med ro....... and would sit down and begin to question staff about being recorded, what they were writing down, and making statements about not trusting staff. Ms. Graves was becoming increasingly paranoid. Ms. Graves during the month would confront staff about the unconstitutionally of her being a PSRB client, telling staff her taxes paid their salaries and was generally confrontational with them. Ms. Graves did this with her QMHA who has a hearing problem and Ms. Graves is a very quiet talker and was very confrontation with her QMHA when they met and those meetings did not go well.

Ms. Graves was upset about her perception of how she was treated in-group and began to demand staff assist her in contacting Oregon Health Authority. After receiving this information, I noticed Ms. Graves had gone to her room and the facility was quiet. I was meeting with another client when I heard a loud scream and went immediately to investigate. When I stepped out of my office I saw Ms. Graves standing in the living room and asked who screamed and Ms. Graves was standing up straight with her hands clasped together in front of her. Ms. Graves looked at me and did not say anything. I took the few steps to the QMHA office and asked who had screamed and was told it was Ms. Graves. I turned to talk to her and was able to say you cannot scream like that when she worked her way around the chair and towards the door to the outside. Ms. Graves was reminded that she could not leave and she turned and cusse·d at me and then ran out the first door. I started to follow her and told her to come back and she kept going. I again told her she did not have permission to leave and if she left she would be revoked. At this point, she was past the second door and into the street when I said that and she turned and came at a dead run through the first door I stepped back behind the second door and closed it mostly and said no when she stopped short of the second door and double flipped me off swore at me some more and then ran back out the door and down the street.

This is the second revocation for Ms. Graves from Alternatives and Alternatives does not seem to be a good fit for Ms. Graves. To be considered for another evaluation Ms. Graves mental health symptoms and beliefs about the PSRB having the authority to monitor her and require her to be compliant would have to be addressed to such a level she would be fully compliant with rules. Ms. Graves would also need to understand the benefits from being under the board and the goals to help her succeed would require her full cooperation.

*Amy Schubert M.A. QMHP, CADC-I*
*PSRB Conditional Release Monitor*
*Pronouns: she, her hers*
**Columbia Community Mental Health**
*503.438.2140*

58646 McNulty Way St. Helens, OR | Phone (800) 294-5211 | Fax (503) 397-5373
*An Equal Opportunity Employer*

Ez-7

PSRB

06/15/2022



RECEIVED
JUN 2 3 2022
P.S.R.B.

The reason for the problems at Altumahleg had nothing to do with me and I did nothing to violate my Conditional Release. Altumafters stall however did none of the things required of them per the Conditional Release agreement.

Examples:

1. I was there a month and they never allowed me to meet with a psychiatrist, psychologist or prescriber. They just kept postponing it every week and making excuses.

2. They refused to take me to the Social Security office to set up my benefits.

3. They made me set up my food Stamp (SNAP) benefits over the phone rather than take me to the St. Helens office. I was told on the phone they had approved me for a total of $1350-500 (I don't remember the exact amount) and to look for my card in the mail. I waited at least 20 days, I never received it. The mail is placed into a locked mailbox by the postal worker only the staff have the key to the box. I was never given my card. Staff said it never arrived. They refused to take me grocery shopping or to shop for clothes and other personal items. I had to order pizza or walk to a store to buy food.

PSRB #13-2628
Exhibit #498
Page 1 of 14

62-9

4. They refused to take me to the Legacy clinic
in St. Helens to resume my medical care, to the
Goodwill to shop for clothes or to the DMV to
renew my ID card (not a driver's license) so
that I could do my personal banking, etc.

5. My CM, Julie, was a seemingly nice lady
but grossly incompetent even for the basic, easy
tasks required of her (driving me to do my errands).
She was admittedly a "recovering" meth addict who'd
spent her entire life chasing a bag of dope and
getting high, and she somehow landed a pity job
as a paper shuffler CM who literally did nothing
besides try to assign me paperwork to tell her what
my goals were and what I needed to do to accomplish
them. I did this, stating that my goals were to
· get a job (which I was working on, I walked to the library
to enquire about jobs and got an application for both work
and volunteer positions, both of which required a valid
ID card; I also spoke with proprietors of local small
businesses about interviews for service employee positions
before I was inexplicably way laid).

· Get my health & food stamp benefits reinstated and
open up a credit union account

· Show that it's responsible, independent and confidence of
running my own life

• work toward independent living and a quiet, normal and productive life with some solitude and time to pursue my hobbies (Aquarium fish, cats, gardening) and to spend time on my art career which has been on hold due to being locked up and deprived of my art supplies and solitude/peaceful life required for this

Julie literally refused to take me to do any of the errands she said she'd do. Every week she'd make an appointment with me then either call in sick on that day or tell me she couldn't drive me and gave me the same stack of paperwork in which I'm supposed to tell her what I need to work on to change myself to make these things happen.

Question: Why am I deemed incompetent to drive despite my perfect record (I somehow got a DUI 25 yrs ago while riding in the passenger seat of my car with a "friend" driving. He pulled out in front of the police who signaled and I got a DUI and they let him drive off in my Chevy Corsica with no license and drunker than I by far. I thought I was being smart making him drive since he was the guy who insisted we go pick up a mutual friend), while this admitted lifelong drug friend who has no work ethic and never shows up for work to do her job is in charge of chauffeuring me around?

PSRB #13-2628
Exhibit #498
Page 3 of 14

ER-10

Other interesting peculiarities:

• after moving into alternatives I received a letter that Dolly Matteucci's office had sent the DMV (signed by a Jennifer whose last name was not printed but the signature was illegible), telling them they did not feel that I was competent to drive a vehicle, having been a former patient of theirs. This letter was dated April 7, 2022. 3 days after my release. I was not even a patient of OSH at the time. Why were they preemptively contacting the DMV to sabotage any future attempts at obtaining a drivers license? Is this not a HIPPA violation? I've never heard of this being done to any other PSRB client nor has anyone else I've spoken with.

• My former treating psychiatrist at OSH, Dr. SimRAT SETHI, was in contact with alternatives manager AMY SCHUBERT from the time of my release and was instructing her on how to "handle me" and control me, according to what she herself told me prior to the revocation attempt. The revocation letter I received was dated three days prior to my abduction w/o charges, before AMY accused me of forgetting to sign out when taking a walk (I did sign the sheet, and I had told staff I was taking a walk — I had to knock on the back office and distract them to let them know, since the front office was unattended. I was gone less than 45 minutes, well within my 60 minute limit. I'd never been cited about forgetting to sign in or out, unlike most residents. Also, the sign in sheets

are all dated 2017 at the top, making them inadmissible
in court or a hearing anyway. They were just relying on
accusations right and left, like asking me if I'd been
drinking (I passed all my urine tests or Am as I
know. I certainly did not consume anything that would
trigger a positive test. I also had a valid ID
which would be legally required to purchase alcoholic
beverages).

AMY Schubert and other staff and residents of Alternatives
are proven liars. If she or anyone else has any proof
that I did anything improper or in any way violated
the terms of my conditional release I demand
that they prove their claims with evidence and
that they be brought into a court room in person
to be cross examined by me under oath.

One of the promises or conditions CCMH agreed to under
the conditional release agreement was that I would be given
PRIVACY. This was violated in every way imaginable and
they entered into this agreement in bad faith. Fraud
vitiates all contracts!

They also discriminated against me on the basis of
gender (biologically male, though I'm a transwoman. They treated me
as they would a White Man, as an enemy), race, sexual
orientation and political beliefs — all violations of the conditional
release. Many of the staff and residents at CCMH are
extreme left-wing cultural marxists, I'd go as far as
to call them outright Communists. They also seem to

practice Moral relativism (a different set of rules for themselves than for others). This is the basis of the Satanic philosophy, something to which I do not subscribe. AMY accused me according to my former attorney Bailey Moody, (whom I fired for refusing to do her job) of "Threatening her Church". What does that even mean? I don't even know what church she belongs to ~~of~~ or what religion she practices. These are the rantings and accusations of a deranged ideologue who has no legitimate argument from which to attack me and no valid reasons to criticize me and is just making stuff up, throwing it at the wall and hoping it will stick. I feel that I'm being unfairly attacked by radical left-wing Zealots because I'm white, biologically male and for a transwoman I'm surprisingly conservative (I'm attracted to women exclusively, have had half a dozen sex partners in my 49 years and I was always monogamous. I believe in the constitution and am against communistic or socialistic totalitarian lunacy...).

A resident named DIANA Z." (only two of the other residents ever disclosed their last names or their real names), a radical left-wing likely transgender 65 year old Native American woman, quickly tried to groom/seduce me upon my moving into Alternatives. She turned out to be a conniving lifelong drug addict and a lazy self-aggrandizing narcissist who thinks the world owes her a living. When I rebuffed the sexual advances of this toothless elderly senior citizen she turned on me and threatened to kill me. She threw a tantrum and started screaming at me in the kitchen

PSRB #13-2628
Exhibit #498
Page 6 of 14

EL 13

during a cooking group. She was absolutely insane. She intimated to me that she and other residents who shall not be named (at this time) killed a young male resident and made it look like he'd committed suicide by cutting his wrists. The whole incident was covered up, like the other murders committed by CMH clients (albeit more successfully). I don't know for certain if the person in question was actually murdered, but by what DIANA told me and the way she threatened me repeatedly (as did other residents) I have no doubt that it's at least likely. This needs to be investigated. DIANA said there was so much blood they tore up all the carpeting in the house, replaced it with hardwood and locked the whole house down under the "Covid" excuse. This woman was quite insane.

On the day I was abducted by the police in St. Helens I had not even finished putting on my makeup or my shoes when I was being relentlessly threatened by other residents and told I'd better run. I had no identification on me nor any identifying characteristics. They said they were just taking me back to the group home. They didn't. They then said they were taking me on a "72 hour physician hold", to unity hospital. They could not tell me on whose orders or who the physician was, and I didn't even have a physician.

At unity hospital, there was a big open room and everyone had to sleep on chairs. Probably 50 to 75 people there, mostly homeless people from what I gathered. Drug addicts. One of them was a staff member from Alternatives who worked the Night Shift. There was a menacing, Black security guard with very long dreadlocks circling around me in a threatening manner. So I took my blankets into one of two small rooms at the back, like holding cells but with no door. Like a little cave, somewhat darker and more private. I did some sketching and coloring and fell asleep on the floor. I awakened being strangled with someone on top of me. I managed to push the person off of me and she sat down across from me. I was seeing stars as you do when someone strangles you, and as my vision returned I saw it was a woman with coke bottle glasses and curly dark hair whom I'd seen lying on a chair in the big room earlier. I panicked, as you do when someone strangles you and you come to disoriented. I stood up and saw that the aforementioned security guard and the other guards, all dressed in black, were standing in front of the door of this little room blocking the view of the other patients and the security cameras (their backs to me). I ran out onto the main room yelling something like "What in the fuck is going on here and why are you people allowing this to happen?" Other patients had been trying to help me but were blocked by the guards. For the coming they put me in a hard car and sent me here.

I'd still like to know what in the Hell was all
that about? Why am I being held here with no
charges and no explanation, no wrongdoing on my
part and nothing but harassment and sexual harassment
verbal and mental abuse by other patients and
staff? This is utterly insane and unacceptable,
I demand an explanation for all of this.

I'm unable to get either my tx team or
anyone else to advocate for me. They're blocking
my access to my finances or the means to contact
a lawyer.

I'm asking that you folks rescind the revocation
& reinstate my conditional release and release me
pending the jurisdictional discharge hearing I plan
to bring with the help of a lawyer paid by the
to be determined who, I'm able to access my
money and communications. As you know, OSH is
now a holding pen for 370 people who are biding their
time waiting for the (likely soros-financed) DA to give up
and drop their charges. This is not a therapeutic environment.
I'm willing to talk about releasing to another facility
if it's not full of lunatic sex offenders who plea bargained
down to a lesser charge (as most of the dope fiends at Attorneys
did), or I would even be willing to pay for a
motel room at my own expense just to escape the
constant abuse by staff here at OSH. I'd even be
willing to wear an ankle bracelet. I'm done with my
way and have nothing to hide, unlike my

PSRB #13-2628
Exhibit #498
Page 9 of 14

accusers and captors. This is among the most egregious miscarriages of justice I've seen in my entire life. I suggest you folks work with my here to limit your own exposure and liability in this ~~bogus to~~ series of crimes committed against me. I remind you I'm here at Tier 2 charges, accused of Burglary for being at my mom's house with her permission (I have letters from her written while I was held in Solitary at Marion Co. Jail (due to my transgender status) stating this and urging me not to take a GEI plea, since she as a social worker at Telecare in Woodburn knew it was a trap). I was swatted by my vindictive sister, who lives in a Ventosa mansion but was intent on taking my mother's entire estate and wanted me out of the way (my mother was in the hospital dying of lung cancer when she left me in charge of the house and caring for our cat's). I later found out my mother's house was purchased by Deb Morselittle, the "Century 21" teacher here at OSH. I'm sure it's just another odd coincidence.

Lets end this charade before it gets any more ridiculous. I'm offering to work with you here. I suggest you take this generous offer. I will be sending copies of this letter to friends in the alternative media so these injustices will not go unnoticed or be covered up or forgotten.

Sincerely, Drucilla Darone: Grace

P.S. I still have the scrubs given to me at Unity & prove my story - They're imprinted with "PHSC" whatever that means.

And look at this OSH ID card photo. Does it look different from all other such photos you've seen? What's with the oblique angle? They don't take photos like that. My photo was not taken upon my abduction by the cops, nor at Unity nor at OSH. Where did they obtain this photo? It appears to have been taken surreptitiously, possibly illegally obtained from my cell phone in my locked room, unlawfully and without a warrant? It almost looks like it was taken while I was lying on the ground unconscious. Either way, it's evidence of a felony committed against me.

I could easily fill a couple hundred more pages with other docs even more illustrative of the malfeasance and tyranny executed against me over the past ten years and beyond that. Those are just a few examples from the last couple months.

This is certainly, in my humble opinion, an inordinate amount of resources and effort expended for the purpose of subjugating any one person - especially one convicted of a tier 2, non-person-to-person charge. There is no rational explanation for the boot to be stamping on my face still after all these years, while the violent lunatic Michael Bryson who tried to murder me for no apparent reason went unpunished and just happened to have been in a publicity photo

with gov. Brown after working on a committee to pass an expungement bill to allow him to cover up his most recent crimes and have no record, but to be unleashed upon the community that you're all so concerned about protecting from me.

This is all so absurd, so disingenuous and so intellectually dishonest it defies belief.

My immediate family may be a bunch of scumbag criminals, but I'm not—nor was my family before these cretins came about. One of my great uncles was the governor of East Africa (Tanzania) when it was a German colony. My people built an advanced civilization there, outlawed slavery and built schools and hospitals for the local people. The Africans loved the Germans so much they fought with them in WW 1 right up until the end, unlike the Dutch and British colonies. I had to change my last name, I'm so ashamed to be related to those conniving people who raised and abused me all my life. I'd like to move on and contribute something positive to society rather than being a multi-million dollar drain on the tax payers just to line the pockets of the drug companies and the quack doctors and abusive glorified prison guards who are employed by and beholden to them. How can any decent person justify this treatment?

By continuing to perpetuate this complete and utter fraud, you're not only taking my life from me a day at a time, which is a very slow form of Murder, you're robbing the community of the contribution and positive influence I would otherwise actually robbing them of millions of dollars of this hard-earned tax dollars over a period of 20 years. This is Obscene. And pointing this out does not make me a "narcissist with a persecution complex" as that narcissistic Sociopath Sim RAT SETH! would characterize me. I'm not the one who thinks I'm important enough for the government to expend this much time and money persecuting. that is the most obvious example of projection I've ever seen right up there with that of Dr. Cher Yao Chen.

"How dare you! You've stolen my dreams and my childhood with your empty words and your lies! People are suffering; people are dying. How dare You!"
        — Greta Thunberg



## NOTICE OF FILING AND PROOF OF SERVICE

I certify that on December 20, 2022, I filed this Appellant's Brief and Excerpt of Record with the Appellate Court Administrator, Appellate Court Records Section, by using the court's electronic filing system.

I further certify that on December 20, 2022 I served this Appellant's Brief and Excerpt of Record on Solicitor General Benjamin Gutman, attorney for Respondent State of Oregon, by using the court's electronic filing system.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the word-count limitation of ORAP 5.05(2), and that, as specified in ORAP 5.05(2)(a)(ii)(A), the count of this brief is 8275 words. I further certify that the size of the type in this brief is not smaller than 14-point for both the text of the brief and footnotes as required by ORAP 5.05(4)(f).

s/Liza Langford
Liza Langford, OSB 882509
Attorney at Law
PO Box 96302
Portland, Or. 97296
Phone: (503) 274-9070
ljanelaw@yahoo.com

From: Stephen Brennan    Fax: +1 (800) 764-6136          To: Mr. Daniel Carroll       Fax: +1 (503) 480-0522          Page 2 of 17 11/9/2012 7:56

# STEPHEN J. BRENNAN, PSY.D. LLC
## CLINICAL & FORENSIC PSYCHOLOGY
OREGON LICENSE # 1341   /   BOX 885, ALBANY, OREGON 97321
TELEPHONE: 541-730-5598   /   FAX: 800-764-6136

**November 8, 2012**

### Criminal Responsibility Evaluation
### of
### Edward Wayne Schnee

#### Identifying Information:

Edward Wayne Schnee, date of birth October 14, 1972, is a 40-year-old male housed at the time of this evaluation in the Marion County Oregon Jail in regards to Case No. 12C46930. He is charged with the following:

Count 1: Burglary in the first degree (A Felony)
Count 2: Unlawful use of a weapon (C Felony)
Count 3: Contempt of court (U Misdemeanor)

Mr. Schnee's attorney is Daniel Carroll. Mr. Carroll hired this psychologist, Stephen J. Brennan, PsyD, to perform a psychological evaluation of Mr. Schnee ("the defendant") for the purpose of offering Mr. Carroll two opinions:

Did Mr. Schnee, on or about October 5, 2012 and due to a mental disease or defect, lack substantial capacity either to appreciate the alleged criminality of his conduct or to conform his conduct to the requirements of the law? (See Oregon Revised Statute 161.295)

Did Mr. Schnee, on or about October 5, 2012, have a mental disease or defect that may serve as a mitigating factor in regards to intent? (See Oregon Revised Statute 161.300)

#### Summary of Index Event:

Salem and Woodburn Oregon Police Department records allege that on October 5, 2012 at approximately 1730 hours Mr. Schnee entered Salem Hospital where his mother was being treated as an in-patient. There is a restraining order not allowing the defendant to be near her. The defendant's sister apparently spotted him and alerted hospital security but the defendant left. Mr. Schnee's mother told police when questioned that the defendant has been staying in her home for the past week and that she does not want him there. Police went to her home (1343 Astor Street, Woodburn, Oregon) the same day at approximately 1900 hours to remove the defendant. He allegedly locked himself in a bathroom when police entered the home. He reportedly threatened them with a knife should they attempt to enter the bathroom. Eventually, the defendant was talked into exiting the bathroom peacefully at which point he was arrested.

#### Organization of Report:

This report is organized into sections presented in the order in which they were

CRIMINAL RESPONSIBILITY EVALUATION
EDWARD WAYNE SCHNEE

conducted (except for Mental Status Exam):

- Informed Consent
- Mental Status Exam
- Defendant's Understanding of Events
- Developmental/Social History
- Legal History
- Medical/Psychiatric History
- Corroborative Data
- DSM-IV-TR Diagnoses
- Professional Opinion

## Sources of Information:

Medical records dated 03-02-12 to 10-05-12, 26 pages
Police and other legal records dated 10-05-12 to 10-30-12, 49 pages
Clinical interview, 10-31-12 (78 minutes), 11-02-12 (54 minutes) and 11-06-12 (47 minutes)
Telephone interview with Michelle McCormick, 11-05-12, 8 minutes

## Informed Consent:

This psychologist began by introducing himself to Mr. Schnee as "Dr. Brennan" and asked him if he knew I would be coming to see him. The defendant said he did. He was asked why. He said, "At the time of my arrest I was in a pretty severe manic episode." He went on to say some other things. He was asked what I had to do with those things. He said, "You're supposed to determine whether I was sane at the time or not or something like that."

I then explained that his attorney wanted me to interview him to see if he had any sort of mental health issues that may have an impact on his case, including whether or not he is able to think clearly enough to help his attorney defend him. I explained that I would write down what we talk about and put it in a report that would then go to his attorney.

This psychologist told Mr. Schnee that anything he brings up in this evaluation might be made available to the court. Mr. Schnee was told he did not have to participate, that anything he said could possibly be used against him, that he had the right to consult an attorney prior to answering any questions, that he had the right to have his attorney present, and that he had the right to not discuss or answer any question at any time. I told him I was on neither his attorney's side nor on anyone else's side. I told him my opinion may possibly end up helping him or hurting him and that my primary goal was only to be as objective as possible.

These rights and limitations were written out and explained on an informed consent form I showed Mr. Schnee and read aloud to him. He did not have any questions about them when I finished. The defendant was asked to paraphrase these rights and limitations in his own words. He said, "It says you're doing this evaluation and I can choose not to participate or not answer any questions and anything else I say can end up in court."

CRIMINAL RESPONSIBILITY EVALUATION                    NOVEMBER 8, 2012
EDWARD WAYNE SCHNEE                                        PAGE 2 OF 16

Mr. Schnee stated he understood these rights and limitations to confidentiality, signed the informed consent form and agreed to proceed.

When I met with Mr. Schnee the second and third times I began by reviewing these rights and limits to confidentiality. He confirmed each time he understood them and agreed to proceed.

## Mental Status Exam:

Mr. Schnee is a 40-year-old male interviewed through the food tray door of his cell on the C4 unit at the Marion County Jail on October 31 and then face-to-face on November 2, and November 6, 2012. He was dressed in jail scrubs. He looked much younger than his stated age. He identifies himself as transgender and so he had on dark purple lipstick, dark eye liner, and dark chipped nail polish and also had plucked eyebrows and black dyed long hair. Hygiene was good. He did not present with any unusual behaviors or mannerisms. No restlessness or psychomotor agitation was observed. Eye contact was good. Speech was normal in rate and rhythm but quite low in amplitude such that I needed him to repeat himself at times. He did not interrupt, kept his statements rather short, and needed no redirection. His thoughts appeared to be clear and organized. Thought content was notable for paranoid delusional beliefs about his family being involved in a CIA mind-control program as well as beliefs about having been drugged and raped by family members and others. He denied, and never appeared to be responding to, internal stimuli and remained well focused throughout the interview. He was oriented to person, place, and time. Recent and remote memory appeared to be intact. Range of affect was moderately constricted but otherwise pleasant. He was cooperative. When asked on November 2nd to describe his mood, the defendant said "I've been pretty depressed lately. A lot of anxiety." Overall intelligence was judged to be within the Average range. Insight into his mental health status was judged to be poor.

## Defendant's Understanding of Events:

This psychologist listened throughout this evaluation for indications of the degree to which Mr. Schnee was competent to aid and assist in his own defense. I asked him specific questions at the outset of this portion of the evaluation regarding competency. I did not hear anything to suggest the defendant is incompetent nor did he answer any competency questions in a manner as to suggest incompetency.

In the 11-01-12 interview, this psychologist asked Mr. Schnee to tell me what was going on with him around the time of his arrest that made him think something was wrong with him. The defendant began by saying, "I wasn't really in my right mind. The whole thing about my mother being in the hospital with lung cancer...." He trailed off. Then he talked of how he was already under a lot of stress prior to his mother's hospitalization because "...she berates me and tells me I'm pathetic and a freak. It's stressful living with someone who treats you like that." The defendant said that sort of stress causes him to have manic episodes.

Mr. Schnee confirmed he had been living with his uncle prior to living with his mother. He said he was kicked out of his home and that caused a manic episode. He said he was kicked out because his mother called his uncle and told him the defendant was

CRIMINAL RESPONSIBILITY EVALUATION                    NOVEMBER 8, 2012
EDWARD WAYNE SCHNEE                                    PAGE 3 OF 16

"crazy." The defendant went on to explain that his uncle dropped him off in Salem where he stayed in a motel for a couple days. He said he was "...ripped off..." of his cell phone, food stamp card, and a ring. He called his mother who came and got him and brought him back to her home.

I asked Mr. Schnee if he did not feel any better once he was at his mother's. He said he did not because she harassed him every day. When asked, the defendant said his mother had been in the hospital two or three days prior to his arrest. I asked him if he did not feel better over the course of those two or three days when he was in his mother's home free of her harassment. He responded, "Not so much because I was worried about her and where I'd end up if she died so that added to the stress."

Mr. Schnee said he was not using any drugs or alcohol during the time he was living with his mother. He was asked what manic symptoms he was experiencing. He said he was "...not sleeping much, spending a lot of time on the computer researching the mind control programs."

On the day of his arrest, Mr. Schnee said his "...whole family..." was lying about how no one could see his mother, apparently including themselves. However, he went there just to ask the nurse about his mother's status and he saw his sister there. He said that did not make him feel very good. He said she then "screamed" for security. When asked why she would scream for security, the defendant said, "I don't know. She'll do that to make me look like the bad guy. They didn't want me having contact (with his mother) because she was all drugged up and she (his sister) was going to manipulate her into getting me all locked up again." I asked the defendant if that was what he was thinking at that time or just afterwards. He just said, "I didn't know they were going to call the police."

Mr. Schnee then talked briefly about how his family members are child molesters and about how his sister's husband is a free mason. He confirmed for me that when he says "family" he means his mother, sister, and brother-in-law. However, he would mention his father at other times.

We backed up a bit. Mr. Schnee explained that he took a bus earlier that day to the community mental health center to get his medications. Then his aunt picked him up to bring him home. However, they stopped by the hospital at the defendant's request to check on his mother. He said his aunt was running late and he told her he was just going to run in and check with the nurse about his mother's status and then come right back out. After his sister started screaming at him, the defendant said he left the hospital, got back in his aunt's car and she drove him home.

Mr. Schnee thought the police showed up at his mother's home about one or two hours later. I asked him what he was thinking when they showed up at the house. He responded by saying he heard knocking and voices saying they were the police but he looked out the window and saw no police cars. He thought it was odd there would be no police cars and so he did not open the door.

Mr. Schnee said he then took a pizza out of the oven, grabbed a knife to cut it with, got his cat, and went into the bathroom and closed and locked the door. I asked him why he did that. He said, "Because I was hungry and wanted to eat the pizza." I asked him

CRIMINAL RESPONSIBILITY EVALUATION                        NOVEMBER 8, 2012
EDWARD WAYNE SCHNEE                                        PAGE 4 OF 16

why he did not just eat it in the kitchen. He said, "I was afraid they'd break the door down. I don't know. Maybe I wasn't thinking straight."

I noted that it was an odd time to decide to eat. Mr. Schnee said the timer went off. I asked him how he managed to carry the pizza, a knife and his cat all at once into the bathroom. He said it was a mini-pizza and he brought that and the knife into the bathroom and then came back out to get the cat.

I asked Mr. Schnee what happened next. He said, "They threatened to send the dog in to attack me and I said I would defend myself against the dog." He then talked of how they wanted him to come out and he offered to talk with them through the door but they would not. I asked him why he thought they were there. He first said, "I don't know" but then talked of how he had sent an email to the CIA a couple days before "...telling them to leave me alone..." because he felt like they were pestering him. He said he figured the police were there outside his mother's bathroom door because of that email.

Mr. Schnee said it ended when the police agreed to pull the dog away and he agreed to slide the knife out under the door. He said he "waited" so I asked him why. He said he ate half the pizza before he came out.

This psychologist interviewed Mr. Schnee again on 11-06-12. At this point in time, this psychologist felt it was clear Mr. Schnee had serious mental health problems characterized primarily by fixed paranoid delusions. However, it was still unclear to me what, if anything, they had to do with his alleged actions outlined in the "Index Event" section, above. Up to this point I had been trying to limit myself to vague and open-ended questions. In this interview, I did ask more pointed questions. I was worried that his investment in his delusional beliefs was preventing him from being more honest about what was really going on that day in his head.

I began by asking Mr. Schnee to describe for me once again the strategy he is hoping to use for defending himself. What he explained to me sounded reasonable although he did not say anything about a mental health defense.

I told Mr. Schnee he had mentioned to me in the past that he thought he might pursue a mental health defense. He said that was still the case. We then talked about the pros and cons of a successful mental health defense. The defendant said he understood when we finished.

I then asked Mr. Schnee to explain to me what mental health problems he thought he had at the time in question and to also explain what they had to do with his behaviors at that time.

Mr. Schnee said, in part, "That I was in the middle of a manic episode and I would've behaved more rationally than hide in a bathroom." I agreed with the defendant his actions at that point did not make a lot of sense. I pointed out to the defendant that he previously told me he did not know who was banging on his door and so I asked him why he did not call the police. He said he has called the police for help on other occasions but it seems he is always the one who gets arrested instead.

I asked Mr. Schnee what he was thinking at that time he gathered up his pizza, knife

and cat and headed into the bathroom. He said, "I don't know. I wanted my cat to be with me so she'd be safe. I didn't want her to get hurt. (Why were you thinking she might get hurt?) Because the police are known for going into people's homes and shooting them." He went on to talk of how the police take advantage of these situations such as when there are no witnesses to see their unlawful actions. The defendant then said the police are rewarded with "paid vacation" whenever they shoot someone. I asked him if he was serious in thinking that. He said they are always placed on "administrative paid leave" whenever they shoot someone.

Mr. Schnee agreed he was afraid of the police when they entered his mother's home. He added that they told him they had a warrant to come in but then said they did not have a paper warrant to show him.

I asked Mr. Schnee when his manic episode started. He said he was "...a little into it the last six or seven months but it got really bad when I got kicked out (of his uncle's home), so that was a couple weeks before (his arrest)." He added that his mother being admitted to the hospital with lung cancer "...didn't help." I asked him why he was kicked out of the house, since his aunt had told me he was fine while there. The defendant reminded me he had explained that his mother called his uncle and told his uncle that the defendant was "...acting crazy." The defendant said his uncle "...got tired of her calling, so he kicked me out."

I asked Mr. Schnee what he noticed about himself that told him he was having a manic episode. He said he had not slept in a couple days immediately prior to his arrest. He hesitantly added that "Maybe I was delusional." He explained that he was thinking at the time that his sister raped him once when he was passed out and possibly drugged. He was thinking her son was the product of that rape. He then said he was also thinking his ex-girlfriend's sister drugged him and raped him and then had a daughter as a result. However, the defendant said he still believes that happened. He said his ex-girlfriend's sister's daughter looks a lot like him.

Mr. Schnee also noted that he had sent the CIA an email a couple days before his arrest telling them to stop harassing him. When asked about other symptoms suggestive of a manic episode, the defendant said, "That's about it. I'm never really aware of my symptoms when they're going on." Prior to his arrest, the defendant said he would spend his time at night working on the computer, doing artwork, and listening to music. He denied believing he had any special powers or abilities. He was not using any drugs or alcohol. He said his mood during those days prior to his arrest was "...pretty much euphoric most of the time. I was in a pretty good mood." He talked of how his sister brought he and his cat some food so he was thinking that meant he was welcomed at his mother's home. I asked him what he meant by "euphoric." He said, "Oh, just happy."

When asked, Mr. Schnee said he knew there was a restraining order in place but also said it was from a year ago and he was thinking it might have expired. I asked him what his manic symptoms had to do with his alleged actions of violating the restraining order and holing up in his mother's home. He said, "Because I don't behave rationally during those periods." I asked him how he thought he would have handled things if he had not been manic. He said, "I probably would've just opened the door but I was just kind of afraid to do that I guess. (Why?) Because I didn't know what to expect."

CRIMINAL RESPONSIBILITY EVALUATION                    NOVEMBER 8, 2012
EDWARD WAYNE SCHNEE                                         PAGE 6 OF 16

This psychologist asked Mr. Schnee to rate the severity of his manic symptoms as they were on the day of his arrest with one being barely noticeable and ten being overwhelming. He said, "It started out as a five." He said after his sister "...flipped out..." in the hospital "...it went to a six or seven or eight." I asked him how he thought he would have handled the hospital situation if he had not been manic. The defendant said he would have called the hospital like he did because he felt it was an emergency situation that would have overridden any restraining order that may have still been in place.

### Developmental/Social History:

Mr. Schnee said he was born in Portland, Oregon after an uneventful pregnancy and delivery to parents who remained alive and married to one another until breaking up when the defendant was about 11. The defendant grew up in Hubbard, Oregon with his mother and his sister who is one year older. He did spend his junior year of high school living with his father in Texas because "...there was a girl there who wanted me to move down there...." He also has a half-sister from his father's second marriage. The defendant's father ran a water pump business. He said his mother stayed at home to raise her children but he later said she became a psychologist while he was in his early 30's. Her name does not come up in a search on the Oregon Board of Psychologist Examiner's website.

Mr. Schnee thought he achieved developmental milestones in a timely manner. He said his grades in grade school were "...pretty good." In middle school he had "...almost a B average." His grades in high school were "About the same." He left high school during his senior year, finished his coursework, and then went to college at a local community college and then Western Oregon State where he majored in art. He dropped out during his third year because of mental health problems. He said this was when he was first hospitalized for psychiatric reasons.

Socially, Mr. Schnee said he did not do very well. When asked why, the defendant talked about his family making fun of him and yelling at him. He said this made him fearful at school about talking with others. He later said he was bullied a lot and beaten up. He said he "...had maybe a couple friends..." during his earlier school years, none during middle school, and then a couple in high school. He said his friends were "outcasts."

Mr. Schnee denied significant childhood behavioral problems including running away, fighting, stealing, setting fires, and hurting animals. He said he was wrongfully accused of setting a fire at school in a garbage can. He was arrested for arson but that charge was changed to reckless burning, which is on his record. He said he was given the opportunity to quit school rather than being expelled and so he quit. This was during his senior year.

Mr. Schnee endorsed a history of physical abuse in that his mother would reportedly beat him with a spatula and metal spoons about three times a week. This stopped when he was able to stand up for himself. He was also beaten up at school by bullies. The defendant "thought" he was sexually abused because his mother has apparently told him his father abused both he and his sister when he was four or five or six. The

defendant remarked that his mother witnessed it but remained married to him for some years.

Mr. Schnee has never been married but he reported three significant relationships. The defendant said he was in a five-year relationship with a young woman beginning when he was 17. He was then in an "...on and off..." relationship with another woman. That relationship produced one son who is now 21. The defendant has no contact with his son, saying his son's mother won't allow it. He said his son's name is Christopher and that his date of birth is 12-03-90. The defendant said he was then in a one-year relationship with a girlfriend who "...sent me to prison (when he was 28)." I chose not to pursue that comment at that time. He said he is presently in no significant dating relationship.

Mr. Schnee was unemployed at the time of his arrest. He has had no employment since his release from prison 16 months ago. The defendant has reportedly been on Social Security Disability since he was 24 or 25 for "...paranoid schizophrenia but now I think they're saying I have schizoaffective disorder." The defendant agreed he has no vocational history to speak of. We then talked briefly about his hopes to earn a living as an artist.

At the time of his arrest, Mr. Schnee said he had been living at his mother's home for one to two weeks. Before that he had been staying at his uncle's for about seven months. When asked how he had been getting along with his mother, the defendant said, "I thought everything was going okay. She never mentioned anything about not wanting me there." The defendant said he does not get along with his sister because she is "...always out to try to screw me over." He said his sister and the rest of his family works for the "Monarch program." He said the Monarch program is "...like a CIA mind-control program. I was sold out by my family as a guinea pig to do practice on."

Mr. Schnee was never in the military.

**Legal History:**

Mr. Schnee's Oregon LEDS report dated October 8, 2012 shows 17 prior arrests plus one in-custody, a total of 33 charges, and 10 convictions.

Charges were: arson I, false info-police ofc-crim off, theft III, criminal mischief II, FTA x2, carry concealed/poss knife, criminal trespass II x2, controlled substance offense-manuf, controlled substance offense-possess, menacing x6, possess firearm/devise-pub bl, city ordinance offense-misuse telephone equip, DUII x2, criminal trespass I, assault IV, violation of release agreement, assault I, unlawful use of weapon, PV x3, contempt of court, and post prison supv sanction. The in-custody charges were assault I and coercion.

Convictions were: reckless burning, criminal trespass I-viol treatment/attempted, coercion, assault IV, DUII, unlawful use of weapon, assault I, and contempt of court-viol restrain order. The in-custody convictions were assault I and coercion.

**Medical/Psychiatric History:**

CRIMINAL RESPONSIBILITY EVALUATION                    NOVEMBER 8, 2012
EDWARD WAYNE SCHNEE                                   PAGE 8 OF 16

At the time this evaluation was begun, Mr. Schnee said he was being prescribed Celexa, Geodon, and Trazadone. He said he was not refusing any medications being offered.

Mr. Schnee said he was hospitalized for "...a couple days..." at age one or two for croup. No other medical hospitalizations were reported. However, he said he did sustain a broken collarbone and a concussion in a motor vehicle accident when he was 23 or 24. He was in a second car accident at 27 and was knocked out for a few seconds. He thinks he might have had one seizure at some time in the past. He has no known allergies. He denied having any medical problems he is being treated for or that he should be treated for.

Near the beginning of this evaluation this psychologist asked Mr. Schnee why he was on the medical unit. He said, "Because of my mental illness, I guess." He said he has been in jail about one month. When asked, he said he has had no disciplinary write-ups. He has been on no other units.

Mr. Schnee said he has been hospitalized for psychiatric reasons on four occasions. The first time was at 21, the second time one and one-half years later, the third time "shortly" after that, and the fourth time at 24. The defendant thought he was having severe manic episodes at those times but his mother reportedly said he was hearing voices and was paranoid. The defendant said he was diagnosed during those hospitalizations with schizophrenia.

Mr. Schnee was first placed on psychotropic medications during his first psychiatric hospitalization. He said he has been on "...mostly antipsychotic." He thinks the Celexa helps "...with the depression and the social anxiety." He thinks the Geodon "...usually keeps me from getting too manic or paranoid."

Mr. Schnee was in some brief counseling when his parents divorced. Otherwise, he said he received no formal outpatient therapy or counseling.

Mr. Schnee agreed that he believes he is depressed. He was asked to describe his symptoms. He said he often feels sad, lacks energy, has no interest or motivation to do things, and has had suicidal thoughts in the past. He said he tried killing himself three or four times in the past. A couple times he took overdoses and a couple times he cut his wrists. He does have very faint scars on his wrists. He denied any history of self-injurious behaviors and thoughts of wanting to harm others. He thinks he has been depressed since he was a child.

Mr. Schnee believes he has had manic episodes. He said he has had periods of time during which he feels "euphoric" and is very talkative. He has increased self-confidence "...but then I get paranoid." He will go for days without sleep during those episodes. The defendant said the euphoria and excitement changes into paranoia at which point he begins believing there are "...hidden subtexts behind what people are saying." He also thinks things on television are directed specifically to him and he draws special connections between unrelated things in his environment. The paranoia eventually subsides and goes away. These episodes last a couple weeks to several months according to the defendant. He denied auditory and visual hallucinations.

Mr. Schnee believes he has bad anxiety, which he called "social anxiety." He said, "I have trouble talking with others." He gets nervous in public. He is also nervous when home alone but it is much less severe. He is nervous around others because he thinks "They'll think I'm weird." He said he has panic attacks "sometimes" but also as often as twice a week. During those attacks he said he experiences severe anxiety, he becomes sweaty and his heart races, and he experiences shortness of breath. He has had these attacks since he was a child.

This psychologist acknowledged to Mr. Schnee that the defendant had a very difficult childhood that included physical abuse. I asked him if he thought those experiences continued to have any sort of impact on his present day functioning. He said he thought he had PTSD. When asked to describe his symptoms, the defendant said, "I feel like that's the reason why I'm so nervous around others." He could offer no other symptoms.

Mr. Schnee said his sleep is better now that he is on Trazadone. His appetite is good. When asked to describe his mood, the defendant said, "I've been pretty depressed lately. A lot of anxiety."

Mr. Schnee was asked to tell this psychologist some more about the "Monarch Program" he had mentioned a couple times earlier in the interviews. The defendant explained that the Monarch Program is a CIA program that practices mind control of others. He said his mother, father, sister, and brother-in-law are all part of this program and that they "...sold me into it...", meaning he is a target of the program. He thought it all started back when he was six or seven at which time his parents had become involved in a new age cult that turned out to be a satanic cult. The defendant said he figured out his family was involved in the Monarch Program when he was 21. He knows they are involved because his mother takes things out of his room without asking and then puts them back, as if she is trying to play with his mind. She also reportedly talks about him with his friends. One friend is also involved. Also, his family members do illegal things but they never get arrested and this means they are protected by the program.

I asked Mr. Schnee why he remains close to his mother if she is doing these things to him. He said, "I always think maybe she'll leave me alone but all she does is bitch to me about how I dress." If I understood him correctly, he remains close to his mother because he wants to keep giving her chances to change, although those were not his words. I also told the defendant it does not appear he has been brainwashed. He mentioned something about the Illuminati, his brother-in-law being a free mason and other such things. Then he explained that he has figured out this whole Monarch Program "...so they can't brainwash me so they just try to keep me locked up."

Earlier in the interview, Mr. Schnee was asked about his substance use history. In 2012 he said he was drinking "a couple" 40 ounce malt liquor beers "once or twice a week." He said his mother would bring him those beers. He denied any past abuse of alcohol. In 2012 he said he smoked "some" marijuana "...a couple times." Marion County Mental Health notes indicate he smoked marijuana once in August and once in September 2012. He said he used to smoke marijuana on what sounded like a regular basis for "...anxiety and stress until I was busted (at 24)." He "dabbled" in methamphetamine prior to going to prison at 28. He said he did not use meth regularly. The defendant smoked heroin once, tried cocaine "...a few times..." when he was 16, used LSD "a few

CRIMINAL RESPONSIBILITY EVALUATION                          NOVEMBER 8, 2012
EDWARD WAYNE SCHNEE                                         PAGE 10 OF 16

times..." when he was 17, and mushrooms "...a little bit..." in his early twenties. He huffed inhalants "...a little bit..." in junior high school. He denied ever trying bath salts or ecstasy. He also denied any prior history of abuse of prescription medications but he said his mother would give him Vicodan "...once every couple of months..." for a bad back and "...to calm my nerves." The defendant has never been in substance abuse treatment.

Family psychiatric history is reportedly positive for bipolar disorder in "...a couple cousins...", bipolar disorder or schizophrenia in a maternal cousin, "...schizophrenia but I'm thinking bipolar..." in an uncle, and "...my mother hallucinates and hears voices."

### Corroborative Data:

Various specific statements contained in records made available to this psychologist as well as information gained from interviews contributed to the formation of my opinions offered at the end of this evaluation. Those statements are presented below in chronological order and include but are not limited to:

Marion County Mental Health (MCMH) records covering 2012 were requested. The first date of service noted was 03-02-12. Mr. Schnee was dropping in after having been released from jail the night before. That note reads, in part, "He feels that his mother is 'having me arrested for bogus charges like identity theft. She is stealing from me.' He stated that he was manic for about two to three months with her keeping him out of the house but now he feels that his mood is under control. After being in jail for 50 days he has been on Celexa 20 mg, BuSpar 10 mg one a day and Geodon." Anxiety was a main focus during the visit but the defendant's diagnosis was listed only as schizoaffective disorder as well as polysubstance dependence "perhaps" in remission and antisocial personality traits.

A MCMH note dated 04-05-12 described Mr. Schnee as doing very well on increased dosages of Geodon, BuSpar, and Celexa. He was not reporting any paranoid thoughts. Delayed sleep onset and early awakening is apparently a chronic issue. He also takes naps. On 05-03-12 he was continuing to do well but complaining of persistent occasional anxiety. Clonidine was added to address that. He was continuing to do well at his 05-31-12 and 06-29-12 visits but the 06-29-12 visit note reads, in part, "He feels that the CIA is conspiring against him because he is an 'anarchist,' and also the Christians and his dad and his family are also conspiring against him. These are active paranoid delusions."

On 08-10-12 Mr. Schnee was described as doing "...pretty good..." but also had some increased complaints of anxiety, especially when out and around people. He mentioned a 20-year history of nightmares every night. In regards to his on-going paranoid delusions, the writer noted, "He does not seem to be troubled with this paranoid delusion at this time." Clonidine was replaced with Prazosin, as needed, to help sleep and decrease nightmares. The 09-07-12 says the defendant is continuing to do well and that the Prazosin has decreased nightmare activity to an extent. There are times he stays up all night. Energy level remains low. "He continues to feel that his girlfriend's family and his family are out to get him and they are watching him." Trazadone was added to help with sleep.

CRIMINAL RESPONSIBILITY EVALUATION
EDWARD WAYNE SCHNEE

NOVEMBER 8, 2012
PAGE 11 OF 16

*date of arrest*

On 09-14-12 Mr. Schnee contacted MCMH to request help with housing, as he was moving out of his uncle's home. The last note is dated (10-05-12.) It reads, in part, "Edward reports his mood today is "not that bad." ... He states that his mother is in the hospital and 'It's not looking good. She has lung cancer.' He also reports that anxiety is still a problem and most of his medications seem to be working okay but the Trazadone did not have too much effect on him. ... His sleep has decreased since his mother has been in the hospital. ... He denies thoughts of harming self or others. He denies visual or auditory hallucinations or any paranoid or delusional thinking. ... He seems to be focusing better."

Woodburn, Oregon Police Department records read, in part:

"We closed in on the bathroom and started to talk with Edward but all he would do was yelling (sic) and scream about not having a warrant, then talk about his sister raping her 5 year old son and his family being involved with the CIA and cartels, doing drug smuggling."
(Woodburn Police Department Case Report, Officer Matt Stearns, 10-05-12)

"Beverly (Schnee) told me around Monday (10/1/12) she took Edward to an appointment and he was acting crazy and talking as if demon possessed (sic) as lots of delusional/conspiracy theory talk. ... She was hospitalized 10/2 - 10/14. ... She said that she constantly tells him she doesn't want him at her home but its hard because she feels she (sic) abandoning her son and he guilts her into letting him stay there. She said this has been going on since last year." (Woodburn Police Department Case Report, Officer Matt Stearns, dated 10-05-12 but probably 10-19-12)

On November 5, 2012 this psychologist spoke by telephone with Michelle McCormick, Mr. Schnee's aunt. Ms. McCormick was first advised that everything we talked about would be included in a report that would go to Mr. Schnee's attorney and that she needed to know that what we talked about would therefore not be confidential. I also advised her that I am on neither the defendant's side nor the district attorney's side. Ms. McCormick stated she understood this and agreed to this interview. However, she sounded reluctant to talk and offered very little elaboration on her answers.

Ms. McCormick said Mr. Schnee stayed with her and her husband from March 2012 until possibly mid-September, 2012. While he was there he was "...very polite." She said he left because she and her husband felt it would be easier for him to live in Salem where he could be closer to his doctors' offices. They live out in the country in Gervais. Ms. McCormick said her husband dropped the defendant off at a motel in Salem for that purpose.

I asked Ms. McCormick if Mr. Schnee was polite right up to the end of his stay with them. She said, "Yes. He was always very polite and respectful."

Ms. McCormick said Mr. Schnee did not work while he stayed with them. He reportedly spent his time doing artwork, listening to music, and doing laundry. She said he kept his room clean. He did not have any friends over but Ms. McCormick pointed out that she and her husband told him they did not want him having guests over. She said her husband would occasionally drop him off at the bus stop. I thought this had something to do with his going out and socializing but she went on to say the defendant would take

CRIMINAL RESPONSIBILITY EVALUATION                         NOVEMBER 8, 2012
EDWARD WAYNE SCHNEE                                          PAGE 12 OF 16

the bus to various appointments.

When asked, Ms. McCormick said Mr. Schnee ate well while he lived with them. His sleep was not as stable. She said he "...was not sleeping very well as a general rule." She did not know if he would stay up all night but was reportedly told by the defendant that he would have nights where he would wake up and have difficulty falling back to sleep. She said there were other times the defendant would sleep late into the morning.

I asked if Mr. Schnee ever offered any complaints about mental health problems. Ms. McCormick replied, "Oh yeah. He was aware he was not well." She said he would complain about how his problems were not identified and addressed earlier in life. I asked what those problems were. She said, "Mainly very paranoid and he had a persecution complex. People taking advantage of him, not getting things he deserved." She said he also thought he was "...the object of some sort of conspiracy." She said the defendant never expressed any paranoid suspicions of her or her husband.

I asked Ms. McCormick if she ever suspected Mr. Schnee of using any drugs or alcohol while he stayed with them. She said, "He had some alcohol issues so we stopped keeping it in the house." She did not say anything specifically about illegal drugs. She did say he took his prescribed medications regularly.

I asked Mr. Schnee on two separate occasions if he would give me permission to speak with his sister. On both occasions he refused.

### DSM-IV-TR Diagnoses:

Axis I   (clinical disorders)
Delusional Disorder, Persecutory Type versus Schizoaffective Disorder, Bipolar Type
Anxiety Disorder, Not Otherwise Specified
Dysthymic disorder
rule out Sleep Disorder

Axis II   (personality disorders & mental retardation)
Schizotypal and Antisocial Personality Traits (Primary Diagnosis)

These diagnoses are described below in order of relevance to this evaluation:

Mr. Schnee has schizotypal traits, if not a schizotypal personality disorder. These traits include but are not limited to such things as odd beliefs or magical thinking, unusual perceptual experiences including bodily illusions, odd thinking and speech, suspiciousness or paranoid ideation, inappropriate or constricted affect, odd or eccentric behavior or appearance, lack of close friends or confidants other than first degree relatives, and excessive social anxiety. His antisocial traits include a persistent failure to conform behaviors to societal norms, failure to plan ahead, impulsivity, lack of remorse and empathy, and consistent irresponsibility.

Delusional Disorder is characterized by the presence of non-bizarre delusions of at least one month's duration in the absence of prominent hallucinations and/or disorganized behaviors. Overall functioning - apart from matters directly relevant to the delusional

beliefs - is not markedly or notably impaired.  Non-bizarre delusions involve situations that could conceivably occur (e.g. being raped or followed) while bizarre delusions involve situations that are clearly implausible and not understandable (e.g. believing one's brain has been replaced by a machine). The Persecutory subtype indicator means the defendant believes his family is members of a CIA program targeting the defendant with attempted mind-control. He also believes he has been drugged and raped in the past.

Schizoaffective Disorder, Bipolar Type would be indicated if the defendant has had both depressive and manic episodes along with the presence of psychotic signs and symptoms that remain present even when the individual's mood is "level." However, it is far from clear to this psychologist that Mr. Schnee has had bona fide major depressive and manic episodes.  Also, his psychotic symptoms have largely been restricted to the less disruptive symptoms more characteristic of delusional disorder as opposed to those found in schizophrenia. Nevertheless, this disorder should still be considered.

Anxiety Disorder, Not Otherwise Specified is in reference to the defendant's report of chronic anxiety.  He said it is far worse when he is around others but remains present when he is home alone.  He said he has had panic attacks in the past. He is not afraid of leaving his home. He stated he has posttraumatic stress disorder but failed to describe enough symptoms to support that diagnosis. Given these various vague complaints, I think the anxiety disorder, nos diagnosis best captures these difficulties.

Dysthymic Disorder is characterized by the presence of a low grade but notable depression persisting for at least two years.  While signs and symptoms such as disturbed appetite, disturbed sleep, low energy, and low self-esteem may be present, I do not think they are severe enough to merit a diagnosis of Major Depressive Disorder.

A Sleep Disorder may very well be present. The defendant reportedly has a long history of disrupted sleep patterns in that he has difficulty falling asleep, he has nightmares, he has early morning awakenings, and he has times when he sleeps during the day. Making a diagnosis requires a sleep study and is further complicated by his habit of napping, by his use of caffeine and by the absence of any sort of daytime structure or daily exercise. Possible sleep disorders include primary insomnia, circadian rhythm sleep disorder, and nightmare disorder.

### Professional Opinion:

This psychologist was asked to offer opinions regarding Mr. Schnee's eligibility for a mental health defense and for using a mental illness as a mitigating factor in his defense.

Oregon Revised Statute 161.295 states: "A person is guilty except for insanity if, as a result of mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of the law."

This psychologist examiner is of the opinion Mr. Schnee did have a mental disease or defect on or about October 5, 2012 but that it did not interfere with his capacity to appreciate the criminality of his alleged conduct and that it did not interfere with his

ability to conform his alleged conduct to the requirements of the law.

I think Mr. Schnee has several serious psychiatric disorders but the most potentially relevant ones are a delusional disorder or a schizoaffective disorder as well as an anxiety disorder. The first two would both be characterized by persecutory delusions having to do with his family trying to brain wash him and the second is characterized primarily by generalized persistent anxiety as well as possible occasional panic attacks. In my opinion, the defendant failed to explain to me what connection either of those disorders had to do with his alleged actions of October 5, 2012. Nor could I find anything in police reports, medical records or in my interview with the defendant's aunt or with the defendant himself that suggested a causative link between these disorders and his alleged actions.

In essence, Mr. Schnee explained to me that he went to the hospital on October 5, 2012 knowing there was a restraining order but suspecting it had expired. Furthermore, he said he thought his mother's serious condition would override a restraining order if it was still in place. He said he just wanted to quickly check with a nurse on his mother's status. The defendant said he thought he was welcomed in his mother's home. The various reasons he gave for locking himself in the bathroom with a knife included being afraid the police would break down the front door, not knowing why, and being afraid they would shoot him. He denied threatening police with a knife and said he instead warned them he would defend himself and his cat from their dog if they sent it in. I did not see how his persecutory delusions or problems with anxiety came into play here.

I was concerned Mr. Schnee might have been keeping delusional thoughts and feelings to himself that he might have been having on October 5, 2012. I thought he would keep them to himself because he knew I would not agree with his beliefs or he might suspect they were "weird" in some way. I questioned him very directly to solicit any such thoughts and feelings. The best I could do was find out he was entertaining beliefs that day that his sister had once raped him sometime previously. He could not explain what those beliefs had to do with his actions that day. He also suggested the police might kill him but he mentioned that in the context of talking about his belief that police officers are highly unscrupulous, generally speaking. He also mentioned thinking the police were there possibly because he sent an email to the CIA two or three days previous. However, he said nothing about how or why it was that this then led him to locking himself in the bathroom. He did not sound as if he was particularly worried at the time about being brain washed, killed, "hunted down" by the CIA and so on. He said he spent some of his time in the bathroom eating pizza.

I think Mr. Schnee has schizotypal and antisocial personality traits and possibly a schizotypal personality disorder. I do think those personality features had a lot to do with his alleged behaviors of October 5, 2012. However, it is my understanding personality traits and personality disorders are not considered mental diseases or defects.

Oregon Revised Statute 161.300 states "Evidence that the actor suffered from a mental disease or defect is admissible whenever it is relevant to the issue of whether the actor did or did not have the intent which is an element of the crime."

This psychologist is of the opinion Mr. Schnee did have one or more mental diseases or

defects on or about October 5, 2012. However, I believe those psychiatric disorders did not have an impact on his ability to form intent. I do think his prominent schizotypal and antisocial personality features had a significant adverse impact on his ability to form intent but those are not considered mental diseases or defects.

Thank you for allowing me to provide this Criminal Responsibility Evaluation of Edward Wayne Schnee. Please contact me if you have any further questions or concerns.

Respectively submitted,

Stephen J. Brennan, Psy.D.
Clinical Psychologist
Oregon license #1341

'S
partment
iervices

# FAX COVER SHEET

| | | | |
|---|---|---|---|
| **Date:** | 10/12/2022 | **Sender:** | Drucilla Graves |
| **To:** | Amy Schubert | **Office Name:** | |
| **Office Name:** | Columbia County Mental Health | **Address:** | 2600 NE Center St. |
| **Address:** | | **City:** | Salem |
| **City:** | | **State:** OR | **Zip:** 97301 |
| **State:** | **Zip:** | **Phone No.:** | |
| **Phone No.:** | | **Fax No.:** | 503-547-2787 |
| **Fax No.:** | 503-397-5373 | **Total Pages:** | 5 |
| **Re:** | | | |

☒ **Urgent**    ☐ **For review**  ☐ **Please comment**  ☐ **Please reply**    ☐ **Please recycle**

**Confidentiality Notice:** The information contained in this facsimile may be confidential and legally privileged. It is intended **only** for use of the individual named. If you are not the intended recipient, you are hereby notified that the disclosure, copying, distribution, or taking of any action in regards to the contents of this fax – except its direct delivery to the intended recipient – is strictly prohibited. If you have received this fax in error, please notify the sender immediately and destroy this cover sheet along with its contents, and delete from your system, if applicable.



Columbia County Mental Health       Dueller-Revran:
                                    Graves

: attn Amy Schubert :

Be advised that I intend to name
you as the defendants in a civil suit
for the egregious violations of my rights
including but not limited to the following.

• Violation of the Americans with Disabilities Act:
  · Operating on the premise of providing mental health
  services while refusing to provide said services; revoking
  my conditional release based on the unproven claim
  that I was developing mental health symptoms,
  while you receive substantial funds via government
  contract to operate as a Mental Health treatment
  facility. During the 29 days I was imprisoned in
  your facility you refused to take me to the Social
  Security office or food stamp office to activate my
  benefits, and refused to allow me to meet with
  your doctor or prescriber despite numerous requests.
  Then, in the absence of any violent or dangerous behavior
  on my part you initiated revocation proceedings against
  me on the pretext that I was suspected of
  becoming symptomatic, despite never having been
  allowed to meet with a provider who would have
  been qualified to make that assessment and
  to make any medication adjustments determined to be
  appropriate (this would be the first step if I was suspected
  of decompensating and would fall under the description
  of "Mental Health treatment services" for which
  the taxpayers give you millions of dollars per year).

2

- Violations of Title 18 1983 § 241 & 242 (violation of rights under color of law and conspiracy against rights)

- 1st amendment violations (censoring my free speech and retaliating against me for expressing political views contrary to your own extreme Marxist ideology)

- 4th amendment - depriving me of my liberty and property without due process (confining me to the house as a knee-jerk reaction to an alleged mistake on the sign-out form - making this decision unilaterally and in a hysterical emotional state without discussing it with the treatment team; packing up my property before my formal revocation hearing)

- 8th amendment - cruel and unusual punishment - unnecessary revocation for something no other resident would ever be revoked for; rescinding my privileges for allegedly making a mistake when signing out for a walk (something every resident has been cited for and was not an issue).

- 14th amendment - equal treatment under the law - you violated this right by revoking me, in my opinion and supported by facts, at the behest of a vindictive and psychopathic resident who happened to be female and a racial minority; giving this person with a long history of engaging in verbal altercations with other residents preferential treatment and revoking me without any opportunity to defend myself against her absurd histrionics after she threw a conniption fit and threatened me for no good reason. This lifelong drug-addicted Communist with a known inability to live peaceably with other residents was apparently viewed by you as a violated valid

3

- Breach of Contract:
  the conditional release agreement we both signed
  was a contract by which you were bound to provide
  the aforementioned services. You upheld none of your
  requirements under this agreement and revoked me despite
  my fulfilling all my obligations to the best of my ability
  (being labeled as "Disabled" and entitled to reasonable accommodation
  for some).

- Neglect - refusing to facilitate transportation to Legacy
  clinic to set up health care services; refusing
  to set up an appointment with your mental health
  provider despite your claim that I was so
  severely mentally ill I had to be revoked due to
  a need for hospital-level care; refusal to
  help me obtain my SNAP card, leaving me with no food
  other than the occasional microwave burrito or
  pizza delivery paid for out of my own pocket —
  as a result I lost 15-20 lbs in the 29 days
  I was subjected to this neglect; Julie shirking
  her duty as my CM to transport me to aforementioned
  appointments and offices by calling in sick or otherwise
  canceling on our scheduled day; Alternative arrangements
  could have been made but I was not made aware
  of this possibility, nor was any attempt made to do so
  (such as calling medical transport, which would have been
  an option as I later learned).

4

- Slander and libel - making false and unsupported claims of inappropriate statements or behavior in an attempt to smear my character and bolster your false claims about me being psychotic. These statements were arrived at second- or third-hand, conflated and misconstrued, taken out of context, and you intentionally misquoted me on the basis of third-hand hearsay allegations that had no basis in fact or objective reality. This caused me a great deal of hardship and emotional distress as well as the loss of my liberty and damage to my reputation. These malicious acts were characteristic of people such as yourself who are said to "cry out in pain as they strike you", playing the victim while in reality inflicting your own aggression upon any unsuspecting person unfortunate enough to become a target of your intolerant, supremacist sense of entitlement.

5



VIRTUS GROUP INVESTIGATIONS
1001 MOLALLA AVE, #118
OREGON CITY, OR 97045

December 19, 2022

Attorney:     Bailey Moody
Client:       Drucilla Graves
Case No.:     12C46930
Investigator: Kristena Hansen, PI-ID #078503

## Statement of Michael Reed

**Mentioned:**

| | |
|---|---|
| Michael Gary Reed | DOB: 03/21/1985 |
| | Cell: (458) 215-5412 |
| Drucilla Ramona Graves | DOB: 10/14/1972 |
| Amy Noelle Schubert | DOB: 05/04/1970 |
| Mercedes Norma Jean Schubert | DOB: 08/26/1998 |
| Brandon Skye Guerra | DOB: 12/21/1992 |

## Background & Summary:

On December 9, 2022 I interviewed by telephone Michael Reed, who is a former resident of Alternatives, a residential treatment facility operated by Columbia County Community Health in St. Helens, Oregon.

According to records in the Lane County Circuit Court, Michael pleaded guilty except for insanity to robbery in the first degree in March 2019 and was sentenced to a 20 year maximum under the Psychiatric Security Review Board jurisdiction. After roughly a year at Alternatives, he is now in independent living and is a full-time employee with CCMH as a peer support specialist.

Our conversation focused on Michael's personal observations and experiences with Amy Schubert and Drucilla Graves. Below is a summary of our discussion.

Page 1 of 5

**Report:**

When Michael Reed arrived at Alternatives in May 2021, he says he had earned one hour of freetime out of the facility once a week. During his first week or two there, he remembers asking staff ahead of time if it was OK to have an extra hour so he'd have more time to spend with his two kids – a 16 year old daughter and 12 year old son – who'd be traveling from Eugene, Oregon.

For Michael, this was a huge deal. He was finally getting back on track after his life and mental health began unraveling in 2015, starting with a divorce in 2016 from his wife of 10 years followed by a two-year stint with homelessness and drug abuse that ultimately landed him in serious trouble with the law.

"Instead of me going to prison for 72 months for a robbery I did while homeless and an addict, I ended up getting a 20 year sentence under the PSRB, all over 72 bucks and a pack of smokes … it's been one hell of a ride," Michael says. "But being able to get out in a couple of years and reestablishing a relationship with my kids was everything."

Ultimately, that first chunk of freetime with his kids never happened.

Michael says this request for an additional hour of freetime was made when former Alternatives PSRB Conditional Release Monitor Amy Schubert was out on vacation. When Amy returned, he says she pulled him into her office, gave him a serious tongue lashing, and revoked all of his freetime entirely.

"She said it was because I went over her head and tried to get something with her not being there," he says.

Because of her other credentials, Amy also required Alternatives residents to have weekly therapy sessions with her in addition to serving as their PSRB case monitor.

In one of their counseling sessions not long after getting his earned freetime revoked, Michael remembers expressing to Amy how bummed out he was about not being able to see his kids and how much he missed them.

"Her response to me was, 'It's very selfish of you to think that everything's going to work out your way,'" Michael says. "Everything she said was just rude and very unkind. She wasn't compassionate. She loved that powerplay."

Michael says Amy's conduct continued to be consistently and persistently inappropriate, insensitive, and unprofessional throughout his 13 months at Alternatives.

For instance, he says Amy would tell his girlfriend, another Alternatives resident, to break up with him and suggested a different Alternatives resident she should date instead.

Michael says Amy used these counseling sessions to rattle off about her personal, religious, and political views without prompting. "And you always had to agree with her on everything she was talking about and smile and act like everything was OK," he says. "And if you had a different viewpoint on anything, it was always, always scrutinized and your viewpoint was never honored."

As time went on, Michael says these interactions with Amy began taking a huge toll. "I wanted to panic every time I had a meeting coming up with her ... Even just talking about this gives me so much anxiety, my heart starts racing," he says. "She was so abrasive and mean and judgemental ... this lady really fucked with my headspace."

Michael says it got so bad that he started secretly recording their sessions so he had proof of wrongdoing as a backstop. But then, he learned that that was illegal. He also tried confiding in a couple other staff he trusted, but as subordinates themselves, there wasn't really much they could do. He also had to be careful because everything you say could be noted in your chart, which was open for reading by all staff, including Amy, and subsequently could open yourself up to retaliation.

Then came the time when Amy noticed he had gotten a new tattoo – a religious cross – which he says she labeled as "mental decompensation" and then proceeded to talk for the next hour about why she abandoned her Catholic upbringing and now identifies as an atheist.

Michael says his next course of action was having his mother sit in on their weekly counseling sessions by phone with Amy's consent, which, as a grown man with two of his own kids, was embarrassing.

"I'm 37, and I had to have my mother do 3-way audio calls for a while, I was feeling discriminated against because of my tattoo," he says. Later on, there was a big staff meeting held with Michael's mother joining in by phone, and he says Amy was called out for her behavior and she offered some apologies.

After that, things improved a bit, their counseling sessions became shorter and discussion topics became relatively more appropriate. But problems still persisted. For example, when staff acknowledged he had improved enough to transition into independent living in December 2021, it took another six months for that to actually happen. Michael says he was never given an explanation for the delay, but he suspects Amy didn't want to lose the $670 he was paying in monthly rent and he wonders to this day what she was reporting back to the PSRB about him.

Page 3 of 5

When he finally moved out of Alternatives into independent living in June 2022, Michael says Amy still kept an iron thumb over him. He remembers asking Amy permission to stay overnight with his girlfriend, which is technically allowed through a pass that must be requested in advance. But Amy's response was to ask a bunch of personal questions about who his girlfriend was, how and when they met, what she did for a living, among other things, and then proceeded to say no to all overnights moving forward.

That was Michael's turning point.

He decided to make a formal complaint against Amy, but he wasn't quite sure where to go since Amy works with both the PSRB and CCMH. He ultimately opted to go through CCMH because when it comes to the PSRB, "I am labeled a 'mentally ill criminal,' so when I'm stamped with that checkbox, who's going to listen to you?" Michael says.

In June 2022, Michael says he met in person with a compliance officer in CCMH's Human Resources Department for about an hour, at which time he was told to exercise patience as these kinds of investigations usually take time.

"But two to three days later, I get a call back from the compliance officer saying that they had enough information to take action," Michael says. He says Amy stopped coming to work almost immediately, using up all of her vacation and personal time before formally quitting sometime in August, maybe September.

The whole ordeal, he says, was extremely stressful but ultimately paid off for him personally and Alternatives.

"I'm still a PSRB client, but I also started working for CCMH at the end of October as a peer support specialist," Michael says. "And right now Alternatives is amazing and they have a great case monitor – Brandon (Guerra) is awesome. The staff and the team and the whole dynamics at that place just shifted when that lady was finally gone, and her daughter (Mercedes Schubert) as well."

Michael says one of the biggest changes at Alternatives was the hiring of QMHPs so the counseling sessions are no longer conducted by the PSRB case monitor.

"It was really awkward saying I'm having a counseling session with my case monitor who's just somebody I should be checking in with like a PO. That makes no sense to me," Michael says. "Who wants to have a counseling session with their PO? … It was like she was doing multiple jobs that conflicted with themselves."

As for Drucilla Graves, Michael says he really didn't have much interaction with her during her short Alternatives stay in early April through early May 2022. He also says didn't

witness what happened between Amy and Drucilla on May 3, 2022 that ultimately led to Drucilla leaving, as he was off site that day volunteering at the local ALANO Club.

Michael did, however, say he remembers witnessing some tension in the common areas between Amy and Drucilla on a few occasions–nothing huge, just weird energy. And he says Drucilla wasn't the only PSRB client he saw get kicked out of Alternatives by Amy. Before this person got the boot, Michael recalls this other person seeming pretty distressed after counseling sessions with Amy.

"Amy really knows how to push your buttons and get under your skin," Michael says. "For some people, that's really going to set them off, especially if they feel like they're being dehumanized or treated less than."

He says Amy also didn't really go out of her way to hide who she liked or disliked.

"If any employee doesn't 'like' somebody, then they're in the wrong job," he says. "Because at the end of the day, a person has to be pretty damn well to move out of the (state) hospital to come back out to the community."

He says the process at the Oregon State Hospital to get cleared for reentering the community is extensive and exhaustive. "For someone to come out and then just all of a sudden be put back, regardless of how it went down, I don't see how it was fair," he says. "I don't think anybody deserves to go back to that hell hole unless you did something that pretty fucked up. It's a terrible place."

-END OF REPORT-



VIRTUS GROUP INVESTIGATIONS
1001 MOLALLA AVE, #118
OREGON CITY, OR 97045

December 16, 2022

Attorney:      Bailey Moody
Client:        Drucilla Graves
Case No.:      12C46930
Investigator:  Kristena Hansen, PI-ID #078503

### Statement of Victoria Colvin

**Mentioned:**

| | |
|---|---|
| Victoria Elizabeth Colvin | DOB: 01/17/1991 |
| | Cell: (971) 899-1415 |
| Drucilla Ramona Graves | DOB: 10/14/1972 |
| Amy Noelle Schubert | DOB: 05/04/1970 |
| Mercedes Norma Jean Schubert | DOB: 08/26/1998 |
| Brandon Skye Guerra | DOB: 12/21/1992 |
| Michael Gary Reed | DOB: 03/21/1985 |

### Background & Summary:

On December 9, 2022 I interviewed by telephone Victoria Colvin, who is currently a resident of Alternatives, a residential treatment facility operated by Columbia County Community Health in St. Helens, Oregon.

According to records in the Josephine County Circuit Court, Victoria pleaded guilty except for insanity to attempted kidnapping in the second degree and unlawful use of a weapon in December 2018. She is now under the jurisdiction of the Psychiatric Security Review Board and has been an Alternatives resident for about one year.

Our conversation focused on Victoria's personal observations and experiences with Amy Schubert and Drucilla Graves. Below is a summary of our discussion.

### Report:

Victoria says she didn't have very much personal interaction with Drucilla Graves, who was an Alternatives resident only briefly–for about a month, from early April through early May 2022. She says Drucilla mostly kept to herself and didn't talk much to the other residents, but she seemed like a nice, pleasant person during the few interactions they did have.

Victoria says she didn't personally witness the incident on May 3, 2022 between Drucilla and former Alternatives PSRB Conditional Release Monitor Amy Schubert, but she thinks she might have been an ear-witness to a portion of it. She says she had just left the building and was walking away when she heard someone leaving through the same front door.

She didn't hear any commotion, so she didn't bother looking back to see who it was, but she assumes it was Drucilla because when she returned–she says she wasn't gone very long, but couldn't remember the exact time–Drucilla was gone and everyone was talking about it.

"Only thing I heard was that Amy stood in the way of the door and that Drucilla was trying to leave," Victoria says.

I ask if she heard any other residents or staff talk about Drucilla possibly "threatening" or "charging" at Amy that day, and Victoria says no.

"There's so much stuff that was said about Amy that it's hard to not be on Drucilla's side," Victoria says.

I ask for clarification, and Victoria begins talking about how relieved she and the other residents were when Amy "supposedly quit" several months ago, and how much better things have been at Alternatives since then. She says Amy's daughter Mercedes Schubert, who was a medications coordinator, also departed shortly after Amy.

Victoria says she suspects Amy actually got fired, or was asked to resign, and I ask her to elaborate. She says it stemmed from a formal complaint made to CCMH by former Alternatives resident Michael Reed, who is now living at a different facility and recently was hired by CCMH as a peer support specialist. Victoria says she and Michael briefly dated while they both lived at Alternatives and have remained friends since he left the facility earlier this year. She says Michael confided in her about his CCMH complaint, the investigation that followed, and Amy's abrupt subsequent departure.

Based on her own personal experience, Victoria says Amy's overall conduct at Alternatives was extremely unprofessional, inappropriate, and often very strange.

"When I first got here, I was pretty symptomatic," Victoria says. "During one of my sessions, Amy said to one of my doctors right in front of me, 'She's got some pretty interesting symptoms!' and started to laugh." She says that made her feel pretty self conscious and small.

Victoria says Amy was also extremely vocal about her liberal political views, and would regularly weave the political hot-topic of the day into their therapy sessions. For example, when the U.S. Supreme Court revoked the right to an abortion this year, Victoria recalls Amy telling her something to effect of, "You really need to think about permanent birth control or whether you want to have more kids." She remembers Amy then drawing strange things on a white board to illustrate her points.

Victoria says this comment stemmed from the fact that Amy knew she was dating Michael at the time—and Amy, she says, went out of her way to talk about that too. She says Amy would make comments like, "I heard Michael's been coming into your room at night," and then spend the rest of their session voicing her opinions on Michael and how Victoria could probably do better.

"She got in the middle of me and Michael's business," Victoria says, adding that Amy's behavior would range from volunteering her personal religious views to making personalized, insensitive comments about things like how she thought Victoria's "issues" stemmed from her mother. "These are the kinds of weird, inappropriate conversations she was having with patients."

Victoria says she was required to have these strange, inappropriate "therapy" sessions with Amy on a weekly basis. Adding to her discomfort was the fact that Amy was also her PSRB mentor as well as her counselor—a combination that never sat right with Victoria. She says it made her fearful to express herself freely in their sessions and uneasiness about what would be reported back to the PSRB if she did.

But all that has changed now, and for the better, she says.

"Everyone was pretty happy when she (Amy) left," Victoria says. She says CCMH has since restructured management, most notably separating the PSRB monitor and counselor roles to be filled by different individuals. Brian Guerra, who was previously the residential administrative assistant, has taken over the PSRB monitor position, which Victoria says basically handles their time sheets and other miscellaneous admin paperwork. Victoria says they still meet with a counselor once a week, but it's never with Brandon.

According to the Mental Health and Addiction Certification Board of Oregon, Brandon is certified as a QMHA-1 and CADC-1. As of the date of this report, I have reached out to Brandon on at least three separate occasions but have not received a response. I've left voicemails and also visited the Alternatives facility in person in hopes of contacting Brandon, but he was not in the office. Before I left, I gave staff a hard copy of a Release of Information signed by Drucilla authorizing CCMH to disclose information to me regarding her time at Alternatives. I have also tried calling Brandon after my visit but still have not received a response.

-END OF REPORT-



VIRTUS GROUP INVESTIGATIONS
1001 MOLALLA AVE, #118
OREGON CITY, OR 97045

December 16, 2022

Attorney:     Bailey Moody
Client:       Drucilla Graves
Case No.:     12C46930
Investigator: Kristena Hansen, PI-ID #078503

### Statement of Lynn Carstens

**Mentioned:**

| | |
|---|---|
| Lynn R. Carstens | DOB: 10/22/1963 |
| | (503) 397-6800 |
| Drucilla Ramona Graves | DOB: 10/14/1972 |
| Amy Noelle Schubert | DOB: 05/04/1970 |
| Brandon Skye Guerra | DOB: 12/21/1992 |

**Background & Summary:**

On December 9, 2022 I interviewed by telephone Lynn Carstens, who is currently a resident at Alternatives, a residential treatment facility operated by Columbia County Community Health in St. Helens, Oregon.

According to records in the Douglas County Circuit Court, Lynn pleaded guilty except for insanity to burglary in the first degree in August 2005. He is now under the jurisdiction of the Psychiatric Security Review Board and has been an Alternatives resident for about a year and a half.

Our conversation focused on Lynn's personal observations on May 3, 2022, the date of the incident between Amy Schubert and Drucilla Graves. Below is a summary of our discussion.

wearing something yellow that day, was having an argument. Lynn says both Drucilla and Amy came back inside but he doesn't really recall much after that other than Drucilla was gone after that.

I ask if he overheard any other specific statements made by Drucilla, such as "threatening" or aggressive language, or if he heard anything that gave him the impression that Amy was alarmed by Drucilla. Lynn says no, everything he overheard just sounded like arguing. I ask if he heard anything that suggested the arguing had escalated to something more physical, such as "charging," "lunging," or any other scuffling-like noises, and he says no.



*View of the exterior front door of Alternatives, 105 S. 3rd Street, St Helens, OR 97051. – by Kristena Hansen, 12/12/2022.*



*View of the second, interior front door at Alternatives, 105 S. 3rd Street, St Helens, OR 97051. This door is only accessible by ringing a buzzer next to the door handle and waiting for staff to unlock it. – by Kristena Hansen, 12/12/2022.*



*Closer view of the second, interior front door at Alternatives, 105 S. 3rd Street, St Helens, OR 97051.*
*Beyond this door are a couple staff offices directly to the right, a large seating room to the left, and a front*
*desk and additional staff offices straight ahead. – by Kristena Hansen, 12/12/2022.*

**Report:**

When asked to describe his relationship with Drucilla Graves, Lynn says, "She was my friend." He says Drucilla was always kind to him and they chatted at least once a day during Drucilla's short one-month stay at Alternatives from early April through early May 2022.

Lynn says he doesn't remember Drucilla having any issues with other residents but she had expressed a couple times being unhappy with some of the services at Alternatives, more specifically that she felt an overall lack of moral support. Lynn doesn't recall Drucilla ever elaborating on that or offering more details or examples.

Lynn says he remembers Drucilla's last day at Alternatives, which was May 3, 2022, because he was an eye and ear witness to some of the events that led to her departure.

To help understand Lynn's description of events, I will briefly explain the layout of the entrance areas at Alternatives, which I personally visited on December 12, 2022. I also included in this report some photographs I took of the front door area that day.

The exterior front door to the facility is wooden with a medium sized circular, foggy glass window in the middle. Right next to this wooden door is a somewhat narrow, floor-to-ceiling clear window. Upon walking through, you enter a short breezeway, maybe 12 feet long, at the end of which is a second door. The second door is metal, has a small window allowing a narrow view of the inside of the facility, and is locked. Entrants are instructed by signs to ring the bell next to the door handle for staff to buzz you in. Next to this door is also a small filing cabinet and a small table equipped with sign in/out sheets, disposable face masks, hand sanitizer, etc.

After staff buzzed me inside, directly to my right was the door to the office belonging to Brandon Guerra, who is the current Alternatives PSRB Conditional Release Monitor. Straight ahead was a front desk and several other individual staff offices. Directly to my right was a large seating area with comfortable chairs and other furniture typically found in a home living room. To see the entire seating area, I had to walk a few steps farther inside, step slightly to the left, and peek my head around a wall.

The aforementioned seating area is where Lynn says he was sitting on May 3. He says everything seemed normal until he overheard some arguing coming from the aforementioned breezeway, which he couldn't see from where he was sitting.

He remembers hearing something like "They're evil!" and he recognized it as Drucilla's voice. Then, he says he heard the exterior wooden door slam shut pretty hard, so he got curious. He says he peeked his head around the corner and saw Amy Schubert, the former Alternatives PSRB Conditional Release Monitor, through the aforementioned floor-to-ceiling window next to the exterior front door. He says it looked like Amy, who he remembers was

Copy of flash card currently in use for purpose of educating .370 patients at OSH. The flow chart clearly indicates that people found GEI for NON-measure 11 (tier 2) felonies are to be immediately conditionally released without being hospitalized at OSH. I was sentenced to be supervised by SHRP while at OSH and after being released by SHRP would be under the PSRB. Several years into my sentence, SHRP was eliminated. This explains why tier 2 patients who previously would have entered OSH under SHRP are to be released without first being hospitalized. The PSRB cannot change the terms of my sentence, effectively making it much more harsh after imposition of the sentence, by assuming jurisdiction of a patient who was sentenced to be under SHRP while at OSH.



(04/2020)